# 12-4355-cv

*To Be Argued By*:
ROBERT J. GIUFFRA, JR.

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CITY OF PONTIAC POLICEMEN'S AND FIREMEN'S RETIREMENT SYSTEM, ("PONTIAC"), ARBEJDSMARKEDETS TILLAEGSPENSION, ("ATP"), UNION ASSET MANAGEMENT HOLDING AG, ("UNION"), COUNSEL OF THE BOROUGH OF SOUTH TYNESIDE acting in its capacity as the administering authority of the Tyne and Wear Pension Fund,

*Plaintiffs-Appellants,*

INTERNATIONAL FUND MANAGEMENT, S.A., (LUXEMBURG), WILLIAM L. WESNER, TEAMSTERS UNION LOCAL 500 SEVERANCE FUND, ("TEAMSTERS"),

*Plaintiffs,*

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, 07-cv-11225

## BRIEF FOR THE UBS DEFENDANTS-APPELLEES

ROBERT J. GIUFFRA, JR.
MATTHEW A. SCHWARTZ
JUSTIN J. DECAMP
THOMAS C. WHITE
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for the UBS*
 *Defendants-Appellees*

Oregon State Treasurer and The Oregon Public
Employee Retirement Board, Alaska Laborers-Employers
Retirement Fund,

*Movants-Appellants,*

—against—

UBS AG, Peter A. Wuffli, Clive Standish, David S. Martin, Marcel Ospel, Marcel Rohner, Marco Suter, Walter Stuerzinger, Ramesh Singh, Huw Jenkins, James Stehli, John Costas, Michael Hutchins, Deutsche Bank AG, BNP Paribas, Credit Suisse, J.P. Morgan Securities Ltd., Morgan Stanley & Co. International PLC, Goldman Sachs International, Deutsche Bank AG, London Branch, UBS Securities LLC, Ernesto Bertarelli, Stephan Haeringer, Gabrielle Kauffman-Kohler, Sergio Marchionne, Rolf A. Meyer, Peter Voser, Lawrence A. Weinbach, Joerg Wolle, Helmut Panke, Peter Spuhler,

*Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for the UBS Defendants-Appellees certifies as follows:

UBS AG is a non-governmental entity with no parent corporation.  No publicly held corporation owns 10 percent or more of UBS AG's stock.

The parent corporation of UBS Securities LLC is UBS AG.  No other publicly held corporation owns 10 percent or more of UBS Securities LLC's stock.

# TABLE OF CONTENTS

*Page*

**ISSUES PRESENTED FOR REVIEW** ....................................................... 1

**STATEMENT OF THE CASE** ................................................................. 2

**STATEMENT OF THE FACTS** ............................................................... 8

    A.      The Parties ......................................................................... 8

           1.      Plaintiffs ............................................................ 8

           2.      UBS .................................................................. 9

    B.      UBS's Positions in Mortgage-Related Securities and Disclosures .............. 9

           1.      UBS Publicly Disclosed Its Investment Bank's Strategy of Accumulating Mortgage-Related Securities ..................................... 9

           2.      The Early 2007 Market Slowdown Affected the Price of DRCM's Lower-Rated Subprime Securities ................................... 12

           3.      Throughout the Financial Crisis, UBS Continually Updated Investors About Its Positions and Losses ........................ 15

    C.      UBS's "Very Small," Swiss-Based U.S. Cross-Border Business ............... 19

    D.      Plaintiffs' Four Complaints ..................................................... 22

    E.      The District Court's September 13, 2011 Decision Dismissing Plaintiffs' Claims Based on Foreign Purchases of UBS Shares ................ 23

    F.      The District Court's September 28, 2012 Decision Dismissing the Complaint's Mortgage-Related Securities, ARS, and Cross-Border Claims ...................................................................... 24

**SUMMARY OF ARGUMENT** ............................................................... 26

**STANDARD OF REVIEW** .................................................................. 29

**ARGUMENT** ................................................................................ 30

*Page*

I.   **THE DISTRICT COURT CORRECTLY DISMISSED ALL
     CLAIMS BASED ON PURCHASES OF UBS SHARES
     OUTSIDE THE UNITED STATES** .............................................30

     A.   The Supreme Court's Bright-Line "Transactional" Test Governs
          Here ....................................................................................... 31

     B.   *Morrison*'s Holding and Reasoning Doom Plaintiffs' "Listing"
          Theory ................................................................................... 32

          1.   *Morrison*'s Holding Forecloses Plaintiffs' "Listing"
               Theory ........................................................................... 33

          2.   Plaintiffs' "Listing" Theory Ignores *Morrison*'s
               Reasoning ...................................................................... 35

          3.   Plaintiffs' "Listing" Theory Ignores the *Morrison* Court's
               Expressed Policy Concerns ............................................. 38

     C.   The District Court Correctly Dismissed Plaintiff Oregon's
          Foreign-Squared Claims........................................................ 40

II.  **THE DISTRICT COURT PROPERLY DISMISSED
     PLAINTIFFS' CLAIMS REGARDING UBS'S POSITIONS
     IN AAA-RATED MORTGAGE-RELATED SECURITIES** ................42

     A.   The District Court Properly Dismissed Plaintiffs' Exchange Act
          Claims, Because Plaintiffs Did Not Satisfy Their Burden To
          Plead Scienter ....................................................................... 44

          1.   Plaintiffs Allege No Cognizable Motive for the Alleged
               Fraud.............................................................................. 46

          2.   Plaintiffs' Scienter Theory Defies Economic Logic ........................ 47

          3.   Under *Tellabs*, the "More Compelling" Inference Is that
               UBS Did *Not* Foresee the Market Collapse that Caused
               Unprecedented Losses in UBS's AAA-Rated Mortgage-
               Related Securities .......................................................... 50

          4.   Plaintiffs' Disparate Allegations Do Not Establish the
               Requisite "Cogent" or "Compelling" Inference of Scienter ........... 54

*Page*

    B.    Alternatively, the Complaint Does Not Plead with the Required Particularity that Any of UBS's Statements About Its Mortgage-Related Positions Were Materially Misleading...........................................73

        1.    The Risk Statements Are Not Materially Misleading.....................73

        2.    Plaintiffs Do Not Allege that the UBS Defendants "Did Not Honestly Believe" the Valuation Statements ............................76

III.    **THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIMS CONCERNING UBS'S "VERY SMALL," SWISS-BASED U.S. CROSS-BORDER BUSINESS, BECAUSE THE COMPLAINT DID NOT PLEAD THAT UBS MADE ANY MATERIAL MISTATEMENTS ABOUT THAT BUSINESS** ...............................................................................77

    A.    As a Matter of Law, UBS's Aspirational Statements About Its "*Aim*[] To Comply" with Legal and Ethical Standards Were Non-Actionable Puffery ....................................................................78

    B.    The District Court Properly Dismissed Plaintiffs' Claims Based on Alleged Misstatements Regarding the Remediation of "Gaps" in UBS's Tax Reporting Systems for Its U.S. Investment Bank ...............83

    C.    Plaintiffs May Not Rely on Appeal on Purported Misstatements Not Alleged in the Complaint ....................................................84

    D.    After Disclosing the DOJ and SEC Investigations, UBS Was Not Obligated To Accuse Itself of Wrongdoing ................................86

    E.    Regulation S-K Did Not Require Additional UBS Disclosures About Its Cross-Border Business in the Rights Offering............................89

IV.    **THE DISTRICT COURT PROPERLY REJECTED PLAINTIFFS' INFORMAL REQUEST FOR LEAVE TO AMEND** ...............................................................................90

**CONCLUSION**.................................................................94

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ...............................................................40

*Acito* v. *IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................... 44, 47, 71

*Ashland Inc.* v. *Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011) ...............................................................74

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .................................................................45

*Bay Harbour Mgmt. LLC* v. *Carothers*,
   282 F. App'x 71 (2d Cir. 2008).................................................... 70-71

*Bellikoff* v. *Eaton Vance Corp.*,
   481 F.3d 110 (2d Cir. 2007) ........................................................ 92, 93

*Brecher* v. *Citigroup Inc.*,
   797 F. Supp. 2d 354 (S.D.N.Y. 2011) ................................... 28, 53, 62

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
   2012 WL 6621391 (2d Cir. Dec. 20, 2012) (summary order) ..................... 52, 80

*Ciresi* v. *Citicorp*,
   782 F. Supp. 819 (S.D.N.Y. 1991) .................................... 29, 51, 86, 88

*City of Omaha, NE Civilian Emps. Ret. Sys.* v. *CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) .................................................................77

*Compania Embotelladora Del Pacifico S.A.* v. *Pepsi Cola Co.*,
   607 F. Supp. 2d 600 (S.D.N.Y. 2009) ........................................... 91-92

*Page(s)*

*Cornwell* v. *Credit Suisse Grp.*,
  729 F. Supp. 2d 620 (S.D.N.Y. 2010) ...............................................41

*ECA, Local 134 IBEW Joint Pension Trust Fund of Chi.* v. *J.P. Morgan Chase & Co.*,
  553 F.3d 187 (2d Cir 2009) ....................................................... passim

*Fadem* v. *Ford Motor Co.*,
  352 F. Supp. 2d 501 (S.D.N.Y. 2005) ...............................................48

*Fait* v. *Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ............................................. 76, 77, 81-82

*First Capital Asset Mgmt., Inc.* v. *Brickellbush, Inc.*,
  218 F. Supp. 2d 369 (S.D.N.Y. 2002) ...............................................73

*First Nationwide Bank* v. *Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ..............................................................52

*Freudenberg* v. *E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................82

*Herman* v. *Legent Corp.*,
  50 F.3d 6 (4th Cir. 1995) ...............................................................81

*Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998) ...........................................................75

*I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) .......................................... 43, 69-70, 87

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
  2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013)............................... 30, 34

*In re Alstom SA Sec. Litig.*,
  741 F. Supp. 2d 469 (S.D.N.Y. 2010) .................................... 30, 35, 36

*Page(s)*

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...................................................82

*In re Bear Stearns Co. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................59

*In re BP P.L.C. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012)...................................................31

*In re Citigroup Auction Rate Sec. Litig.*,
  700 F. Supp. 2d 294 (S.D.N.Y. 2009) ...................................................53

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...................................................86

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008) ........................................... 87, 88

*In re Infineon AG Sec. Litig.*,
  2011 WL 7121006 (N.D. Cal. Mar. 17, 2011) ......................................30

*In re JP Morgan Chase Sec. Litig.*,
  2007 WL 950132 (S.D.N.Y. 2007) .......................................................72

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ................................................................91

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
   643 F. Supp. 2d 366 (S.D.N.Y. 2009) ..................................................86

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010) ........................................... 88-89

*In re PXRE Grp. Ltd. Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009) ........................................... 50, 51

*Page(s)*

*In re Royal Bank of Scot. Grp. PLC Sec. Litig.*,
765 F. Supp. 2d 327 (S.D.N.Y. 2011) ..................................................30

*In re Salomon Analyst Level 3 Litig.*,
373 F. Supp. 2d 248 (S.D.N.Y. 2005) ........................................... 63, 76

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
2013 WL 28053 (S.D.N.Y. Jan. 2, 2013) ................................. 31, 41, 71

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) .................................................53

*In re Societe Generale Sec. Litig.*,
2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ............................... 31, 41

*In re Tamoxifen Citrate Antitrust Litig.*,
446 F.3d 187 (2d Cir. 2006) ..............................................................91

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ..................................................................84

*In re Vivendi Universal S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ......................................... 30, 34

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ......................................... 53, 61

*Intercontinental Planning, Ltd.* v. *Daystrom, Inc.*,
24 N.Y.2d 372 (N.Y. 1969) ..............................................................41

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
131 S. Ct. 2296 (2011) ........................................................... 45-46, 76

*JP Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*,
412 F.3d 418 (2d Cir. 2005) ..............................................................86

*Page(s)*

*Kalnit* v. *Eichler*,
   85 F. Supp. 2d 232 (S.D.N.Y. 1999) .................................................46

*Kiobel* v. *Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) ..........................................................39

*Kleinman* v. *Elan Corp*,
   706 F.3d 145 (2d Cir. 2013) ....................................................85

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ......................................................80

*Lemond* v. *Manzulli*,
   2009 WL 1269840 (E.D.N.Y. Feb. 9, 2009) ........................................74

*Lentell* v. *Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ....................................................52

*Lighthouse Fin. Grp.* v. *Royal Bank of Scot. Grp.*,
   2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012) .................................. 59, 61, 62, 63

*Lipsky* v. *Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976) ....................................................63

*Local 144 Nursing Home Pension Fund* v. *Demisay*,
   508 U.S. 581 (1993) ............................................................35

*Local 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*,
   430 F. App'x 63 (2d Cir. 2011) .................................................52

*McNamara* v. *Pre-Paid Legal Servs., Inc.*,
   189 F. App'x 702 (10th Cir. 2006) .............................................49

*Millea* v. *Metro-North R.R. Co.*,
   658 F.3d 154 (2d Cir. 2011) ............................................ 60, 65, 74, 75

Page(s)

*Mori* v. *Saito*,
   2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ................................. 30-31

*Morrison* v. *Nat'l Austl. Bank*,
   547 F.3d 167 (2d Cir. 2008) ........................................................ 33-34

*Morrison* v. *Nat'l Austl. Bank*,
   130 S. Ct. 2869 (2010) .............................................................. passim

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................... 59, 70, 71, 82

*Phelps* v. *Stomber*,
   883 F. Supp. 2d 188 (D.D.C. 2012) ....................................................41

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*,
   694 F. Supp. 2d 187 (S.D.N.Y. 2010) ................................................53

*Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*,
   753 F. Supp. 2d 166 (S.D.N.Y. 2010) ......................................... 41, 75

*Pope Inv. II, LLC* v. *Deheng Law Firm*,
   2012 WL 3526621 (S.D.N.Y. Aug. 15, 2012) ....................................31

*Richman* v. *Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ......................................... 82, 89

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................. 46-47, 50

*Rothman* v. *Gregor*,
   220 F.3d 81 (2d Cir. 2000) ...................................................... 45, 54

*RSM Prod. Corp.* v. *Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................63

*Page(s)*

*Ruotolo* v. *City of New York*,
514 F.3d 184 (2d Cir. 2008) ...................................................................92

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009) ...................................................... 5, 45, 47

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) .................................................................75

*Sgalambo* v. *McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y. 2010) ...............................................31

*Shields* v. *Citytrust Bancorp., Inc.*,
25 F.3d 1124 (2d Cir. 1994) ...................................................... 49-50, 51

*Slayton* v. *Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010) ...............................................................60

*Stackhouse* v. *Toyota Motor Co.*,
2010 WL 3377409 (C.D. Cal. July 16, 2010) .....................................41

*Stratte-McClure* v. *Morgan Stanley*,
784 F. Supp. 2d 378 (S.D.N.Y. 2011) ................................................59

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ...................................................... 51-52

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................... passim

*Page(s)*

*Wilson* v. *Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ............................................................ 85, 91, 92, 93

*Woodward* v. *Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010) .................................................53

*Zalaski* v. *City of Bridgeport Police Dep't*,
  613 F.3d 336 (2d Cir. 2010) ...........................................................82

## STATUTES, RULES, AND REGULATIONS

17 C.F.R. § 229.503(c) ...................................................................... 89-90

Private Securities Litigation Reform Act of 1995,
  15 U.S.C. § 78u-4(b)(1)................................................................. 73, 85

Rule 15, Fed. R. Civ. P. ....................................................................91

## OTHER AUTHORITIES

ADRs, Securities Act Release No. 33-6894,
  1991 SEC LEXIS 936 (May 23, 1991) ..............................................34

SEC, *Study on the Cross-Border Scope of the Private Right of Action Under
  Section 10(b) of the Securities Exchange Act of 1934* (Apr. 2012) ......... 33, 34-35

## ISSUES PRESENTED FOR REVIEW

1.    Did the District Court correctly dismiss Plaintiffs' claims based on their purchases of UBS AG ("UBS") shares outside the United States under *Morrison* v. *National Australia Bank*, 130 S. Ct. 2869 (2010), where Plaintiffs' "listing" theory—which would expand the reach of Section 10(b) of the Securities Exchange Act ("Exchange Act") to cover claims based on foreign purchases of shares if an issuer "cross-lists" its shares for trading on both U.S. and foreign exchanges—is contrary to the Supreme Court's holding, reasoning, and policy concerns?

2.    Did the District Court correctly hold that Plaintiffs did not plead a strong inference that the UBS Defendants (defined *infra* n.5) acted with scienter in making disclosures about UBS's positions in, and valuation of, AAA-rated mortgage-related securities, where the more compelling inference is that UBS, like regulators and peer financial institutions, simply did not foresee the unprecedented collapse of the U.S. housing market beginning in 2007?

3.    Did the District Court correctly hold that (i) aspirational statements in UBS's disclosures—*e.g.*, that UBS "*aim*[*s*] to comply with all applicable [legal] provisions"—were inactionable puffery, and (ii) UBS, after disclosing pending U.S. government investigations, had no duty to accuse itself or

its employees of uncharged tax-related misconduct until the resolution of those investigations?

## STATEMENT OF THE CASE

In December 2007, in the early stages of the "largest shock since the Great Depression" (Joint Appendix ("JA") 1158 (International Monetary Fund ("IMF")), Plaintiffs filed their first complaint in this action. In that complaint and the three that followed, Plaintiffs have sought to blame the decline in UBS's share price—which fell in line with the share price of UBS's peer financial institutions during the financial crisis—on three separate purported "frauds" on UBS's shareholders.

Specifically, Plaintiffs alleged securities fraud in connection with UBS's disclosures regarding (i) UBS's positions in, and valuation of, mortgage-related securities, and (ii) UBS's positions in, and writedowns of, auction rate securities ("ARS").[1] Seizing on UBS's February 19, 2009 settlements with the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") involving certain activities of UBS's small, Swiss-based U.S. cross-border business involving U.S. taxpayers, Plaintiffs also tried to manufacture a securities fraud claim against Defendants, even though UBS never made any disclosures

---

[1]    On appeal, Plaintiffs abandon their fraud claim concerning UBS's statements about ARS. (*See generally* Plaintiffs' Br. at 30-89.)

about that business and promptly disclosed to investors the existence of the DOJ and SEC investigations.

In two thorough decisions, Judge Sullivan systematically evaluated and dismissed the allegations in Plaintiffs' 1,477-paragraph Amended Complaint ("Complaint") covering a five-and-a-half-year putative class period of August 13, 2003 to February 23, 2009 (the "Class Period").

*First*, Judge Sullivan correctly ruled that the Supreme Court's *Morrison* decision, which held that Section 10(b) does not "apply extraterritorially," 130 S. Ct. at 2883, barred all of Plaintiffs' claims based on their purchases of UBS shares outside the United States, which constitute the vast majority of the putative damages in this action.  By taking one clause of *Morrison* out of context, Plaintiffs claim that, notwithstanding *Morrison*'s holding and reasoning, the Supreme Court intended to expand Section 10(b)'s reach to cover claims based on "worldwide" purchases of shares if an issuer "cross-lists" its shares for trading on both U.S. and foreign exchanges.

But Plaintiffs' "listing" theory conflicts with *Morrison*, where the Supreme Court dismissed the plaintiffs' claims, even though National Australia Bank's ("NAB") shares were *listed* on the New York Stock Exchange ("NYSE"). (*See* JA728.)  Plaintiffs' theory also contravenes *Morrison*'s (i) strict application of the presumption against extraterritoriality, and (ii) concern that the extraterritorial

-3-

application of Section 10(b) would interfere with foreign securities regulation.  As a result, every court to consider this "listing" theory, including nine district judges in this Circuit, has rejected it.  *See infra* n.6.

      *Second*, as Judge Sullivan held, Plaintiffs' claims challenging UBS's disclosures concerning the UBS Investment Bank division's ("Investment Bank" or "IB") positions and losses in mortgage-related securities implausibly posit that UBS's senior executives conspired for the bank to accumulate tens of billions of dollars in securities that they *knew* were overvalued.  Plaintiffs have never explained—in the District Court or in this Court—why those UBS executives would engage in what Judge Sullivan rightly recognized would be "a suicide pact to just go down in flames with [their] mortgage-backed securities" (JA3506), instead of shorting these securities, as a few prescient financial institutions did.

      Plaintiffs also never explain why, if the UBS Defendants had such knowledge, they (i) caused UBS to repurchase more than $4.1 billion of its own shares "at a knowingly inflated price" (Special Appendix ("SPA") 24), and (ii) repeatedly made detailed and timely disclosures to investors concerning UBS's mortgage-related securities, including numerous profit warnings and earnings preannouncements of tens of billions of dollars in writedowns.  Moreover, Plaintiffs make no allegations of insider trading here, and they continue to gloss over that, during the putative Class Period, UBS's senior executives, many of

whom lost their jobs after the bank's writedowns of mortgage-related securities, received at least half of their incentive compensation in restricted UBS shares that vested over a five-year period.  Thus, UBS executives had every motive *not* to commit this suicidal "fraud."

Because the question of Defendants' motive here weighs decisively against fraud, Plaintiffs must plead scienter on a "conscious recklessness" theory, *i.e.*, "an extreme departure from the standards of ordinary care," which "approximate[s] actual intent."  *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109-10 (2d Cir. 2009) (quotations omitted).  Plaintiffs try—but fail—to meet their burden, by labeling reflexively as "red flags" what were, at most, various non-actionable "instances of corporate mismanagement," *Santa Fe Indus.*, *Inc.* v. *Green*, 430 U.S. 462, 477 (1977), that caused UBS to suffer billions of dollars in losses in what the markets and regulators believed were safe, liquid securities.

In particular, the Complaint selectively excerpts UBS's own public disclosures, especially an April 2008 post-mortem report that UBS published to explain to its shareholders the causes of UBS's writedowns (the "Shareholder Report").  But, as required by this Court's decisions, Judge Sullivan correctly "examin[ed] the *entirety* of Plaintiffs' scienter allegations" (SPA34 (emphasis added)), including the entirety of UBS's disclosures, which made clear that these

-5-

purported "red flags" did not relate to UBS's AAA-rated mortgage-related securities, which were perceived as low-risk until, as the Complaint acknowledges, the "markets severely dislocated in the summer of 2007." (JA181 ¶ 314.)

Viewing the Complaint "in its entirety" (SPA34), and scrutinizing Plaintiffs' supposed "red flags," Judge Sullivan correctly held that Plaintiffs did not satisfy their burden under *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.* of pleading a "strong inference" of scienter "at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. 308, 314 (2007). Here, as Judge Sullivan found, the more compelling *Tellabs* inference is that UBS, like almost every other major financial institution and government regulator, "simply did not anticipate that there would be a market-wide downturn impacting its various businesses and, ultimately, UBS's shareholders." (SPA34.)

*Third*, Plaintiffs try to convert the conduct of 45 to 60 Swiss-based UBS employees who assisted certain UBS customers in evading U.S. taxes into a fraud by UBS on its *shareholders*. These claims—brought under both the Exchange Act and the Securities Act of 1933 ("Securities Act") in connection with UBS's May 2008 rights offering ("Rights Offering")—stem from UBS's settlements with the DOJ and SEC, in which UBS acknowledged that its "very small," Swiss-based U.S. cross-border business helped some U.S. clients evade U.S. taxes.

-6-

These settlements—which concern an alleged fraud against the U.S. government—do not assert that UBS made any fraudulent misstatements in its disclosures *to its shareholders*, nor do they provide a basis for Plaintiffs to allege securities fraud.  Because UBS never made *any* disclosures about its Swiss-based cross-border business until disclosing the DOJ and SEC investigations, Plaintiffs cherry-pick generalized aspirational language in UBS's disclosures, such as UBS's "*aim*[] to comply with all applicable provisions" and "*belie*[*f*] … [in] promoting a corporate culture that adheres to high ethical standards."   (SPA47 (second emphasis added).)

Judge Sullivan correctly held that such aspirational statements were inactionable puffery under *ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ("*JP Morgan*"), where, even though senior executives allegedly knew the bank was engaged in the Enron fraud, this Court held that similar aspirational statements were inactionable puffery. Judge Sullivan also correctly held that UBS timely disclosed the nascent DOJ and SEC investigations and was not required, as Plaintiffs contend, to accuse some of its employees of "uncharged illegal conduct" (SPA44) before those investigations were resolved.  In fact, courts have repeatedly held that public companies do not have to accuse themselves or their employees of wrongdoing before the government has done so.   Plaintiffs' unprecedented disclosure rule would require

-7-

companies to speculate about the outcome of incomplete government and internal investigations, and to make binding admissions, contrary to their shareholders' interests, while in the midst of responding to, and attempting to settle, such investigations on the best possible terms.

At bottom, on appeal, Plaintiffs hope that this Court will ignore the big picture and assume that "there must be a claim somewhere" in their 548-page Complaint. But, as the Supreme Court and this Court have made clear, a securities fraud complaint cannot rest on the cherry-picking of an issuer's disclosures, implausible inferences, and unsupported speculation. This Court should affirm Judge Sullivan's reasoned dismissal of the Complaint in its entirety.

## STATEMENT OF THE FACTS

### A.    The Parties

#### 1.    Plaintiffs

Lead Plaintiffs—four institutional investors, three of which are foreign—bring claims on behalf of all "worldwide" purchasers of UBS shares during the putative Class Period. (JA77.) Over 99% of Lead Plaintiffs' alleged damages rest on their purchases of UBS shares on the Swiss Exchange. (JA642.) In addition, over 90% of named Plaintiff Oregon's damages stem from its purchases of UBS shares on the Swiss Exchange. (JA642-43.)

-8-

2. **UBS**

Headquartered in Switzerland, UBS is a global financial institution operating in 50 countries. (JA695.) During the putative Class Period, UBS's ordinary shares were listed for trading on the Swiss Exchange, the Tokyo Stock Exchange, and the New York Stock Exchange. (JA698.) Approximately 88% of the worldwide trading volume in UBS's ordinary shares during the putative Class Period occurred outside the United States. (JA762.)

B. **UBS's Positions in Mortgage-Related Securities and Disclosures**

1. **UBS Publicly Disclosed Its Investment Bank's Strategy of Accumulating Mortgage-Related Securities.**

From 2005 through 2007, UBS's Investment Bank accumulated a portfolio of almost exclusively AAA-rated residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"). (JA1388-89.) As Plaintiffs did not contest in the court below, the market knew from UBS's disclosures that these securities were largely backed by subprime and Alt-A[2] residential loans. (*See* SPA27; JA1075 n.11; 1570; 1584.)

As explained in the Complaint, even though these RMBS and CDOs were mainly collateralized by pools of non-prime mortgages (*e.g.*, JA135 ¶ 166), these securities were structured into tranches. Credit agencies gave the most

---

[2]    Alt-A "is a category which included all mortgages that fell below prime status, but above subprime status." (JA133 ¶ 162.)

"super senior" of these tranches the highest possible AAA rating, because, as recognized in the Complaint, these tranches received "first priority on cash flows" from the underlying mortgages and were the last tranches to absorb losses from defaults on those mortgages.  (*See* JA134 ¶ 165; 137-39 ¶¶ 175, 178.)

According to Standard & Poor's, "an issuer or obligation rated 'AAA' should be able to withstand an extreme level of stress and still meet its financial obligations.  *A historical example of such* [*an extreme stress*] *scenario is the Great Depression*."  (JA1073 (emphasis added).)  The RMBS and CDOs in which the UBS Investment Bank invested received this AAA rating, because these securities had high levels of subordination, that is, the lower-rated tranches of these securitizations had to be "fully exhausted before the … senior tranche experienced any losses."  (JA139 ¶ 179.)  Public officials and regulators recognized that, at this time, AAA "credit ratings [were] a powerful green light for conservative investors all over the world."  (JA1443 (Comptroller of the Currency); 1443-45 (collecting similar statements by government officials and ratings agencies).)

UBS underwrote and traded RMBS and CDOs as part of its *publicly announced* strategy to grow the Investment Bank's fixed income business.  (JA157 ¶ 234; 158-59 ¶¶ 239-41; 1520-32.)  In 2006, UBS disclosed that it was "seeking to expand [its] fixed income business further by pursuing opportunities in

... asset-backed securities," and its desire to "strength[en]" its "non-agency [mortgage] and subprime business." (JA1538.)

The Complaint quotes UBS's disclosures for each of the first three quarters of 2006 (*see* JA330-35 ¶¶ 691-711; 339-43 ¶¶ 722-35) showing that, by October 31, 2006, UBS had accumulated CHF 124 billion in asset-backed securities (*see* JA1551; 1554-55; 1559-60). In fact, citing these very disclosures, the Complaint itself fatally concedes that "[t]he effect on UBS's balance sheet of its ... investment in subprime-backed CDOs was *immediately apparent*." (JA178 ¶ 307 (emphasis added).)

On appeal, Plaintiffs improperly try to amend the Complaint to disavow their concession by maintaining that UBS's "frenzied investment" in mortgage-related securities was only "immediately apparent *to Appellees*." (Plaintiffs' Br. at 66 n.27.) But the Complaint cites the publicly disclosed increases in UBS's positions in "asset-backed securities," reflected in the quarterly and annual filings described above (JA178-79 ¶¶ 307-08), as the basis for Plaintiffs' allegation that the substance of UBS's subprime-related holdings was "immediately apparent."

In any event, as the District Court recognized, the Complaint itself makes clear that "the market already had an understanding that UBS had a large mortgage-related securities portfolio," and Plaintiffs never contested that "the

-11-

market knew that [these] asset-backed securities included large positions in securities backed by subprime and Alt-A residential loans."  (SPA26-27; *see also* JA1569; 1582.)

### 2. The Early 2007 Market Slowdown Affected the Price of DRCM's Lower-Rated Subprime Securities.

In 2005, UBS launched Dillon Read Capital Management LLC ("DRCM"), which managed (i) certain proprietary positions of UBS, and (ii) client money in a separate outside investor fund ("OIF").  (JA159 ¶ 242; 162 ¶ 250; 165 ¶ 261.)  Unlike the UBS Investment Bank, DRCM invested in higher-yielding and *lower-rated* mortgage-related securities more likely to experience losses from defaults on the mortgages underlying those securities.  (JA134 ¶ 165; 1469.)  As the Complaint alleges, "the [subprime] market moved [downward] in mid to late February 2007" (JA437 ¶ 978 (quotations omitted)), but this "market move[ment]" affected only the price of *lower-rated* securities—not the price of the higher-rated securities held by the UBS Investment Bank—and caused DRCM to mark down these lower-rated holdings.[3]

---

[3]    That the February 2007 "market move[ment]" only affected lower-rated securities is confirmed in the Complaint's reproduction of charts of the ABX Index—an index that tracks the price of insurance on 20 subprime RMBS of similar vintage (JA2150)—which show that, during the *early* part of 2007, lower-rated RMBS referenced in the index declined in value, while AAA-rated securities did not (JA148-51 ¶¶ 209-17).

In contrast to the losses stemming from the low-rated securities held by DRCM, Plaintiffs have not alleged any movement in the market for the *AAA-rated* securities held by UBS's Investment Bank in the first half of 2007. (JA148-51.) Indeed, in April 2007, after some financial institutions announced writedowns on whole loans (JA482-84), which unlike AAA-rated structured securities were exposed to first-loss risk, the IMF reported that "even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures ***will not face losses***." (JA1629 (emphasis added).)

On May 3, 2007, UBS publicly reported its first-quarter 2007 results, disclosing "negative trading revenues from the proprietary capital managed by DRCM of approximately CHF 150 million in the context of difficult market conditions in US mortgage securities." (JA1639.) UBS stressed that "[t]he US sub-prime mortgage market suffered a major dislocation in February resulting in significant markdowns and reduced liquidity, with limited contagion to other markets." (JA1642.) That same day, UBS announced DRCM's closure. (JA1649-50.)

As detailed in two reports to UBS shareholders and an investigative report by UBS's primary bank regulator, the Swiss Federal Banking Commission ("SFBC") (*e.g.*, JA106 ¶ 79; 203-04 ¶¶ 382-83), in response to DRCM's

-13-

markdowns on its lower-rated securities, UBS undertook several reviews of the UBS Investment Bank's own positions in AAA-rated mortgage-related securities. On March 29, 2007, Chief Risk Officer Walter Stuerzinger ordered a review by Group Internal Audit ("GIA"), which concluded in June 2007 that "the [DRCM's] write-downs resulted from a combination of extraordinary market developments" and a trading strategy for these lower-rated securities that did not perform as expected."  (JA1502.)  "[GIA's] review also highlighted that (i) improvements were required in analyzing, measuring and reporting risks inherent in sub-prime related activities; and (ii) valuation uncertainties in both IB and DRCM portfolios were not sufficiently transparent and inherent risks were not adequately analyzed." (*Id.*)

Immediately after receiving this report, UBS management "requested an in-depth analysis of the trading positions of the [Investment Bank] ... to ascertain whether the [Investment Bank] was exposed to risks similar to those of DRCM," but the "results of this ... analysis [became] available only after the Subprime mortgage crisis had unfolded [in the summer of 2007]."  (JA1393.)

In addition to GIA's review, in April 2007, UBS's Business Unit Control reported its assessment of the "principal valuation issues for UBS's mortgage securities" to UBS's Audit Committee, stating that, although "[t]he diminished market liquidity and transparency" in the first quarter of 2007 had led

-14-

to "a substantial reduction in the coverage of independent price testing of Subprime securities," the UBS Investment Bank's AAA-rated super senior securities were a "net flat risk or low risk for valuation purposes." (JA1458-59.) And, on April 25, 2007, Ernst & Young ("E&Y"), UBS's independent outside auditor, advised the UBS Audit Committee that "nothing had come to [its] attention to indicate that fair values [of UBS's portfolios] at 31 March 2007 were inappropriate." (JA1460.)

>    **3.    Throughout the Financial Crisis, UBS Continually Updated Investors About Its Positions and Losses.**

After recovering somewhat during the second quarter of 2007 (JA1665 (UBS 2Q 2007 (Form 6-K))), market conditions for mortgage-related securities worsened by late July. On August 14, 2007, UBS disclosed its second quarter results. UBS warned that "[i]f the current turbulent conditions prevail throughout the [third] quarter, [UBS] will probably see a very weak trading result in the Investment Bank," "mak[ing] it likely that profits in the second half of 2007 will be lower than in the second half of last year." (JA1666.) In so doing, UBS was among the first of its peers to issue a forward-looking warning about the potential impact of the nascent crisis on its profits.

In that same disclosure, UBS also announced that, as a result of these market conditions, it had sustained losses: "Continued difficulties in the US mortgage securities market led to lower revenues in our rates business and further

-15-

losses in some of DRCM's former portfolios. The DRCM business itself contributed net negative revenues of approximately CHF 230 million in second quarter 2007." (JA1665.)

As the "markets severely dislocated in the summer of 2007" (JA181 ¶ 314), even previously secure AAA-rated mortgage-related securities began declining in value and became illiquid. As a result, as government regulators, financial institutions, and market observers recognized, the valuation of these securities became extraordinarily difficult. For example, the SEC's Office of the Chief Accountant stated: "The current environment has made questions surrounding the determination of fair value particularly challenging for preparers, auditors, and users of financial information." (JA1673.)

As the financial crisis developed over 2007 and 2008, UBS issued repeated disclosures regarding its losses in previously AAA-rated mortgage-related securities held by its Investment Bank:

- *October 1, 2007*: The first day after the end of its third quarter, UBS preannounced estimated third-quarter results, disclosing "significant write downs on positions in Super Senior AAA-rated tranches of CDOs" and a likely pre-tax loss for the quarter. (JA1683-84.)

- *October 30, 2007*: UBS reported third-quarter results in line with its pre-announcement, including a net loss on subprime RMBS and CDO positions of $4.4 billion. (JA1697.) UBS also disclosed its RMBS

-16-

and CDO exposure, including the size and nature of its subprime positions and the valuation models used to value these positions. (*Id.*) UBS also warned that it "remain[ed] exposed to further deterioration in the US housing and mortgage markets as well as rating downgrades for mortgage-related securities." (JA1693.)

- **December 10, 2007**: As financial market conditions worsened in the fourth quarter, UBS pre-announced an expected loss for the fourth quarter and year, including a $10 billion writedown. (JA1716.) The next day, UBS provided additional detail on its exposures and valuation methodology. (JA1742-48.)

- **January 30, 2008**: UBS issued a further pre-announcement of fourth quarter losses on subprime positions, which now totaled $12 billion, and $2 billion in losses on other residential mortgage-related positions. (JA1755.) Nearly all UBS's peers announced further significant mortgage-related writedowns for the fourth quarter of 2007. (*See* JA1081 (*e.g.*, Citigroup ($18.1 billion), Merrill Lynch ($14.3 billion) and Morgan Stanley ($9.4 billion)).)

- **February 14, 2008**: UBS disclosed its results for the fourth quarter, including losses of $13.7 billion on subprime and Alt-A positions in RMBS, super senior CDO tranches and reference-linked notes, as well as on credit protection purchased from monoline insurers. (JA1788.) UBS further warned that "[UBS] expect[s] 2008 to be another difficult year." (JA1787.)

- **April 1, 2008**: UBS preannounced its expected results for a third consecutive quarter, disclosing an additional $19 billion writedown on U.S. real estate and related positions. (JA1767-68; 1815-16.)

-17-

Ultimately, from February 13, 2006 to July 3, 2008, the relevant dates concerning the Complaint's alleged mortgage-related securities "fraud" (JA588 ¶ 1352), UBS, like almost all its peers, recorded substantial writedowns on its mortgage-related securities and suffered corresponding declines in its share price:

| Financial Institution | Writedowns in Mortgage-Related Securities | Stock Price % Change |
|---|---|---|
| Bear Stearns | $3.2 billion | -93% |
| Washington Mutual | $14.8 billion | -86% |
| Wachovia | $22.5 billion | -73% |
| Lehman Brothers | $8.2 billion | -66% |
| Citigroup | $55.1 billion | -59% |
| Merrill Lynch | $51.8 billion | -56% |
| **UBS** | **$44.2 billion** | **-55%** |
| Royal Bank of Scotland | $14.9 billion | -44% |
| Bank of America | $21.2 billion | -42% |
| Barclays | $9.1 billion | -42% |
| Morgan Stanley | $14.4 billion | -26% |
| Credit Suisse | $10.5 billion | -19% |
| Wells Fargo | $10 billion | -16% |
| Deutsche Bank | $10.8 billion | -8% |
| HSBC | $27.4 billion | -5% |
| JP Morgan Chase | $14.3 billion | -4% |

## C.    UBS's "Very Small," Swiss-Based U.S. Cross-Border Business

During the putative Class Period, UBS had three core businesses—Global Wealth Management & Business Banking, Global Asset Management, and the Investment Bank.  (JA2215.)  UBS's Global Wealth Management business consisted of two divisions—Wealth Management US and Wealth Management International & Switzerland.    (JA2217.)    In 2007, Wealth Management International & Switzerland had operating income of CHF 12.866 billion and net new money ("NNM") of CHF 125.1 billion, and total assets under management at year-end of CHF 1.294 trillion.  (JA2794.)

UBS's Swiss-based U.S. cross-border private banking business—the business involved in the tax-related conduct here—was part of Wealth Management International & Switzerland and was, as the DOJ noted in its Deferred Prosecution Agreement ("DPA"), a "very small part" of UBS's overall Global Wealth Management business.  (JA2256 ¶ 8 (DPA).)  "This U.S. cross-border business … employed about 45 to 60 Swiss-based private bankers or client advisors who specialized in servicing U.S. clients" (JA2255 ¶ 6 (DPA)), and generated approximately $120-$140 million in annual revenues (a measure greater than operating income) for UBS from 2001 to 2007 (JA2256 ¶ 8 (DPA)).  By contrast, UBS had overall operating income in 2007 of nearly $30 billion (CHF 31.98 billion).  (JA2206.)  Accordingly, in 2007, UBS's Swiss-based U.S. cross-

-19-

border business contributed less than 0.4% of UBS's overall operating income, and only approximately 0.3% of the NNM of UBS's Global Wealth Management business. (*See* JA2256 ¶ 8 (DPA); 2206; 2793.)

On May 6, 2008, in its 2008 first-quarter report, UBS specifically disclosed:

> The Department of Justice ("DOJ") and the SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to US clients during the years 2000-2007. In particular, DOJ is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service in 2001. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor. UBS is cooperating with these investigations.

(JA2339.)

This was the first time that UBS had ever mentioned this small business in any of its public disclosures. On the same day, UBS also disclosed that the risks of the pending investigation (and other similar investigations) to UBS were uncertain and left UBS "expose[d] to potentially significant litigation risks." (*Id.*)

-20-

On May 23, 2008, UBS repeated its May 6 disclosure regarding the DOJ investigation and added:

> As has been reported, in connection with this investigation, a senior UBS employee was detained by U.S. authorities as a "material witness", and he remains in the U.S. until his status as a witness is resolved.  As has also been previously reported, a former UBS AG client advisor was charged in an indictment unsealed on May 13, 2008 in the Southern District of Florida with conspiring to defraud the United States and the Internal Revenue Service in connection with providing investment and other services to a U.S. person who is alleged to have evaded U.S. income taxes on income earned on assets maintained in, among other places, a former UBS AG account in Switzerland.

(JA2768.)

On February 19, 2009, UBS entered into the DPA with the DOJ, which found that UBS's compliance systems were "inadequate," and that UBS internal investigations failed to uncover the misconduct in this business.  (JA2219-63.)  That same day, UBS entered into a settlement with the SEC "[w]ithout admitting or denying the allegations" of the SEC's complaint.  (JA2175-2200.) Neither the DOJ nor the SEC accused any of UBS's executive officers of securities fraud or otherwise suggested that any UBS public disclosures were inadequate in any respect.

### D.     Plaintiffs' Four Complaints

On December 13, 2007 and January 29, 2008, separate plaintiffs filed complaints against UBS based on allegations about UBS's Investment Bank's losses in mortgage-related securities. On July 11, 2008, Plaintiffs filed a consolidated amended complaint, adding claims based on UBS's losses in ARS and alleged misconduct related to UBS's U.S. cross-border business. By March 20, 2009, Defendants had filed three memoranda of law in support of Defendants' motions to dismiss that complaint.

On May 8, 2009, after Judge Sullivan had previously told Plaintiffs that it was "[his] presumption ... that this is going to be the last amended complaint" (JA1142), Plaintiffs filed the operative Complaint—the fourth complaint in this action—which, in addition to asserting Exchange Act claims against UBS and certain of its current and former directors, officers, and employees,[4] added (i) further allegations concerning the cross-border business, and

---

[4]     Plaintiffs assert Exchange Act claims against UBS and against Peter Wuffli, Marcel Ospel, Marcel Rohner, Clive Standish, Marco Suter, Walter Stuerzinger, Huw Jenkins, Ramesh Singh, David Martin, James Stehli, John Costas, and Michael Hutchins (the "Individual Defendants"). Plaintiffs assert Securities Act claims against UBS, UBS Securities LLC, Ernesto Bertarelli, Stephan Haeringer, Gabrielle Kaufmann-Kohler, Sergio Marchionne, Rolf Meyer, Marcel Ospel, Helmut Panke, Marcel Rohner, Peter Spuhler, Marco Suter, Peter Voser, Lawrence Weinbach, and Joerg Wolle (together with UBS and the Individual Defendants, the "UBS Defendants").

(ii) Securities Act claims against UBS, its directors, UBS Securities LLC, and the Underwriter Defendants.[5]   The Securities Act allegations are based on a UBS registration statement filed April 8, 2008, and prospectus supplement filed May 23, 2008, relative to UBS's Rights Offering (JA604-05 ¶¶ 1400-01), which entitled UBS shareholders to purchase seven shares at $20.59 per share for every 20 shares held (JA1878).

By January 29, 2010, the parties had briefed both the UBS Defendants' and the Underwriter Defendants' motions to dismiss the Complaint. On March 19, 2010, the District Court terminated the pending motions with leave to renew after the Supreme Court issued its decision in *Morrison*.  Defendants then renewed their motions to dismiss, first on August 31, 2010 on the *Morrison* issues, and later on December 15, 2011 for the Complaint's failure to state a claim.

**E.    The District Court's September 13, 2011 Decision Dismissing Plaintiffs' Claims Based on Foreign Purchases of UBS Shares**

On September 13, 2011, following the Supreme Court's decision in *Morrison*, Judge Sullivan granted the UBS Defendants' motion to dismiss all claims based on purchases of UBS shares outside the United States, including claims asserted by both the foreign plaintiffs and Oregon.  Judge Sullivan held that

---

[5]    The Underwriter Defendants are:  J.P. Morgan Securities Ltd., Morgan Stanley & Co. International plc., BNP Paribas, Goldman Sachs International, Credit Suisse, and Deutsche Bank AG, London Branch.

Plaintiffs' "listing" theory—under which any non-U.S. issuer that "cross-lists" any of its shares for trading on U.S. and foreign exchanges could be sued for securities fraud on behalf of a worldwide class of investors—turned on a "strained interpretation" and "hyper-technical parsing" of *Morrison* that "is in stark tension with the language of the opinion as a whole." (SPA5.)

Similarly, he held that Oregon's purchases of UBS shares did not occur in the United States simply because Oregon placed a "buy order" from this country to acquire UBS shares on the Swiss Exchange: "there is nothing in the text of *Morrison* to suggest that the Court intended the location of an investor placing a buy order to be determinative of whether such a transaction is 'domestic' for purposes of § 10(b)." (SPA8.)

F.    **The District Court's September 28, 2012 Decision Dismissing the Complaint's Mortgage-Related Securities, ARS, and Cross-Border Claims**

On September 28, 2012, Judge Sullivan granted Defendants' motions to dismiss the Complaint with prejudice for failure to state a claim.

As to UBS's positions in mortgage-related securities, Judge Sullivan, after examining "the entirety" (SPA34) of the Complaint's allegations, held that Plaintiffs pled no plausible theory of fraud. Plaintiffs' "ability to plead a strong inference of scienter" was "undercut[]" by the fact that UBS's Investment Bank would not have made "substantial investments in mortgage-related securities" had

-24-

UBS executives known that those securities were overvalued.  (SPA24.)  Thus, Judge Sullivan reasoned that the "more compelling inference" was that "the UBS Defendants simply did not anticipate that there would be a market-wide downturn impacting its various businesses and, ultimately, UBS's shareholders."  (SPA34.)

Judge Sullivan also held that Plaintiffs did not plead any cognizable motive to commit fraud or plead the required strong inference of scienter under a conscious recklessness theory, because (i) the purported "red flags" on which Plaintiffs relied to second-guess UBS's valuation of its AAA-rated securities did not relate to those securities, and (ii) in light of UBS's $2 trillion balance sheet, UBS's publicly disclosed accumulation of mortgage-related securities did not contradict UBS's prior statements about avoiding "undue" risk concentrations. (SPA26-29.)  Applying this Court's decision in *JP Morgan*, Judge Sullivan also ruled that UBS's statements regarding its goal of avoiding "undue" risk concentrations were inactionable puffery.  (SPA26.)

Judge Sullivan also rejected Plaintiffs' claims concerning UBS's cross-border business, because (i) UBS's aspirational statements about its efforts to comply with legal and ethical standards in the conduct of its global business were "no more than non-actionable puffery" (SPA35), and (ii) "alternatively, UBS had no further duty to disclose the uncharged conduct related to the alleged tax fraud" beyond its disclosures of the then-pending DOJ and SEC investigations.  (*Id.*)  He

further ruled that Plaintiffs abandoned in the motion to dismiss briefing their challenges to UBS's statements that it had fixed gaps in its tax-reporting system, which lacked merit in any event.  (SPA36.)

With respect to the Securities Act claims, Judge Sullivan held that the UBS Defendants had no duty to disclose "uncharged illegal conduct" concerning UBS's "very small" cross-border business, a "minor business unit," because such conduct "cannot be described as among the 'most significant factors' making the Rights Offering speculative or risky."  (SPA43.)  And, in any event, UBS's own disclosures, bolstered by articles in major news publications, "revealed the existence of the DOJ and SEC investigations into UBS's alleged involvement in a tax evasion scheme and the risk that the danger to UBS would grow considerably."  (SPA46.)  The District Court further held that the sole named plaintiff lacked standing to bring the claim under Section 12(a)(2).  (SPA38-40.)

Finally, Judge Sullivan denied Plaintiffs' informal request for leave to amend contained in their opposition brief below.  (SPA50 (granting dismissal "with prejudice").)

## SUMMARY OF ARGUMENT

This Court should affirm Judge Sullivan's comprehensive and well-reasoned decisions for the following reasons:

*First*, Judge Sullivan correctly dismissed all of Plaintiffs' claims based on purchases of UBS shares outside the United States.  In doing so, he joined every other court to consider this issue in rejecting Plaintiffs' "listing" theory as a "hyper-technical parsing" of *Morrison* (SPA5) conflicting with the Supreme Court's holding, its transactional test for determining the scope of Section 10(b), and its stated policy goal of avoiding "interference with foreign securities regulation."  130 S. Ct. at 2886.

*Second*, the Complaint does not plead the required "strong inference" that the UBS Defendants acted with scienter in making statements regarding the UBS Investment Bank's positions in AAA-rated mortgage-related securities. Plaintiffs identify no conceivable reason why the Individual Defendants, who were economically incentivized to protect the *long-term* health of the bank, would knowingly accumulate billions of dollars in overvalued securities and lose their jobs when those securities inevitably declined in value.  And, the Complaint's mishmash of supposed "red flags" ignores the distinction, recognized in the very reports and filings integral to the Complaint, between the UBS Investment Bank's AAA-rated securities (which were not expected to suffer losses) and lower-grade securities owned by DRCM (which declined in value much earlier).

After "examining the entirety of Plaintiffs' scienter allegations" (SPA34), Judge Sullivan joined numerous courts that have dismissed similar

"stock drop" lawsuits filed in the wake of the recent financial crisis.  He correctly concluded that, under *Tellabs*, the more compelling inference to be drawn from the Complaint is that "any alleged failure to disclose [was] 'more likely attributable to the financial turmoil occurring in 2007 than to fraud or recklessness.'"  (SPA34 (quoting *Brecher* v. *Citigroup, Inc.*, 797 F. Supp. 2d 354, 371 (S.D.N.Y. 2011) (Stein, J.) and collecting cases).)  As Judge Sullivan noted, the Complaint gives rise to an inference, at most, that "UBS made a series of bad bets with disastrous consequences for the company and its shareholders," but poor investments "are insufficient to establish scienter and support a claim for securities fraud." (SPA34.)

      *Finally*, Judge Sullivan rightly rejected  Plaintiffs' claims under both the Exchange Act and Securities Act stemming from UBS's tax-related regulatory settlements.  Applying this Court's decision in *JP Morgan*, Judge Sullivan held that UBS's aspirational statements regarding its "*aim*[] to comply with all applicable provisions [of the law]" and "*promoti*[*on*] [of] a culture that adheres to high ethical standards" were inactionable puffery, because such statements were "too general to cause a reasonable investor to rely upon them."  (SPA47-50 (quoting *JP Morgan*, 553 F.3d at 205-06).)

      Judge Sullivan also properly dismissed Plaintiffs' claim that UBS's prompt disclosures of these investigations were misleading insofar as those

disclosures did not disclose additional details about the matters under investigation. Applying settled law, Judge Sullivan held that UBS had no "affirmative duty to speculate" about the outcome of the pending investigations, nor any duty to disclose "uncharged, unadjudicated wrongdoings or mismanagement." (SPA44 (quoting *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (Owen, J.), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992)).)

## STANDARD OF REVIEW

Under the Private Securities Litigation Reform Act of 1995 ("Reform Act") and Federal Rule of Civil Procedure 9(b), the pleading requirements for securities fraud are heightened. "Any complaint alleging securities fraud must ... stat[e] with particularity the circumstances constituting fraud." *JP Morgan*, 553 F.3d at 196 (citing *Tellabs,* 551 U.S. at 323). Thus, the Complaint must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)) (alteration in original).

To plead scienter, the Complaint must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)). To qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable—it must

-29-

be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

## ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY DISMISSED ALL CLAIMS BASED ON PURCHASES OF UBS SHARES OUTSIDE THE UNITED STATES.

The Complaint purports to bring claims on behalf of *all* purchasers of UBS shares on *all* "[w]orldwide exchanges." (JA77.) Because nearly 90% of the trading volume in UBS shares during the putative Class Period occurred overseas, the vast bulk of the alleged damages here arises out of foreign transactions. Judge Sullivan correctly dismissed these claims under *Morrison*, which held that Section 10(b) does not apply extraterritorially, because "the focus of the Exchange Act is ... upon purchases and sales of securities in the United States" and does not extend to "claims asserted by ... Plaintiffs arising out of the purchase of UBS stock on a foreign exchange." (SPA8 (quoting *Morrison*, 130 S. Ct. at 2884).) In so holding, Judge Sullivan joined every other Court in rejecting Plaintiffs' "listing" theory. [6]

---

[6]    *See IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 1223844, at *2 n.2 (S.D.N.Y. Mar. 27, 2013) (Forrest, J.); *In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, 765 F. Supp. 2d 327, 335 (S.D.N.Y. 2011) (Batts, J.); *In re Infineon AG Sec. Litig.*, 2011 WL 7121006, at *3 (N.D. Cal. Mar. 17, 2011); *In re Vivendi Universal S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 531 (S.D.N.Y. 2011) (Holwell, J.); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472 (S.D.N.Y. 2010) (Marrero, J.); *see also Mori* v. *Saito*, 2013 WL 1736527, at *8 n.11 (S.D.N.Y. Apr. 19, 2013) (Forrest, J.) (dismissing claims under *Morrison* based on

(*footnote continued . . .*)

-30-

**A.    The Supreme Court's Bright-Line "Transactional" Test Governs Here.**

In *Morrison*, the Supreme Court did away with this and other Circuits' multi-factor "conduct" and "effects" tests, which turned on the location of the alleged fraud and the fraud's effects in the United States, in favor of a bright-line "transactional" test.  Under *Morrison*, Section 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  130 S. Ct. at 2884.  The Supreme Court held that the conduct and effects tests violated the presumption against extraterritoriality, *i.e.*, the "longstanding principle of American law" that, unless a statute gives a "clear indication of an extraterritorial application," the statute "is meant to apply *only within the territorial jurisdiction of the United States*."  *Id.* at 2877-78 (emphasis added) (quotations omitted).

Because Section 10(b) refers only to purchases of "any security registered on a national securities exchange or any security not so registered," *id.*, at 2881-82, the Supreme Court found "no affirmative indication in the Exchange

purchases of securities outside of  United States); *In re Satyam Computer Servs. Ltd. Sec. Litig.,* 2013 WL 28053, at *18 (S.D.N.Y. Jan. 2, 2013) (Jones, J.); *Pope Inv. II, LLC* v. *Deheng Law Firm*, 2012 WL 3526621, at *5 (S.D.N.Y. Aug. 15, 2012) (Stanton, J.); *In re Societe Generale Sec. Litig.*, 2010 WL 3910286, at *5-6 (S.D.N.Y. Sept. 29, 2010) (Berman, J.); *Sgalambo* v. *McKenzie*, 739 F. Supp. 2d 453, 487 (S.D.N.Y. 2010) (Scheindlin, J.); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 794-95 (S.D. Tex. 2012).

Act that § 10(b) applies extraterritorially," *id*. at 2883.  Rather, the  Court held "the focus of the Exchange Act is not upon the place where the deception originated, but upon *purchases and sales of securities in the United States*."  *Id*. at 2884 (emphasis added).

In addition, the Supreme Court emphasized two policy considerations supporting its adoption of its bright-line "transactional" test.  *First*, citing the *amici* submissions of foreign governments and trade organizations, *Morrison* stressed that a "transactional" test would reduce "interference with foreign securities regulation."  *Id*. at 2886.  *Second*, the Court warned that an extraterritorial application of Section 10(b) would turn the United States into "the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets."  *Id*.

   **B.    *Morrison*'s Holding and Reasoning Doom Plaintiffs' "Listing" Theory.**

In an argument tellingly relegated to the back of their brief, and rejected by every district court to consider it, Plaintiffs contend that Judge Sullivan erred in dismissing their "foreign-cubed"[7] and "foreign-squared" [8]  claims, because

---

[7]     "Foreign-cubed" claims are claims in which "(1) *foreign* plaintiffs [are] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries."  *Morrison*, 130 S. Ct. at 2894 n.11 (Stevens, J., concurring).

"[*Morrison*'s] holding is not applicable when U.S. exchange-registered securities" (SPA5) are at issue, even if plaintiffs purchase those securities on a foreign exchange. (Plaintiffs' Br. at 80-84.) Certain *amici* pressed this argument in support of plaintiffs in *Morrison*.[9] Therefore, if Plaintiffs are right, the Supreme Court adopted this "listing" theory, while simultaneously ruling *against* the *Morrison* plaintiffs. Judge Sullivan rightly rejected this "strained" interpretation. (SPA5.)

###    1.    *Morrison*'s Holding Forecloses Plaintiffs' "Listing" Theory.

Plaintiffs' "listing" theory, if valid, would mean that *Morrison* itself *was wrongly decided.* In *Morrison*, the Court noted that "[t]here are listed on the New York Stock Exchange … National's American Depositary Receipts (ADRs), which represent the right to receive a specified number of National's Ordinary Shares." 130 S. Ct. at 2875.[10] Because SEC and NYSE rules require that

---

[8]    "Foreign-squared" claims are those "asserted by American investors who have purchased securities of (1) foreign issuers on (2) foreign exchanges." (SPA3.)

[9]    *See*  SEC, *Study on the Cross-Border Scope of the Private Right of Action Under Section 10(b) of the Securities Exchange Act of 1934* (Apr. 2012), available at    http://www.sec.gov/news/studies/2012/929y-study-cross-border-private-rights.pdf at 18 & n.53 ("*SEC Study*").

[10]    "An ADR is a security denominated in U.S. dollars that represents a certain number of shares, or fraction of shares, of ordinary stock in a foreign corporation." *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *2 (S.D.N.Y. Dec. 14, 2009) (Cote, J.). "If [an investor] own[s] an ADR, [he] ha[s]

(*footnote continued . . .*)

companies that list ADRs on the NYSE register the underlying shares with the SEC and list those shares on the NYSE (though not for trading),[11] NAB's own shares were listed on the NYSE.  Indeed, the very first page of NAB's annual report filed with the SEC—which was front and center in the *Morrison* joint appendix (JA728)—expressly stated that NAB had registered its ordinary shares and related ADRs with the SEC and listed its ADRs for trading on the NYSE.[12]

As the SEC itself has explained in its Congressionally mandated study of the territorial scope of the private right of action under the Exchange Act, if Plaintiffs' "listing" theory had merit, "the *Morrison* litigation itself would have been decided differently because ... defendant National Australia Bank's stock was

---

the right to obtain the foreign stock it represents." *Morrison* v. *Nat'l Austl. Bank*, 547 F.3d 167, 168 n.1 (2d Cir. 2008).

[11]    *See* ADRs, Securities Act Release No. 33-6894, 1991 SEC LEXIS 936, at *34 (May 23, 1991) ("[W]hen there is a public offering of securities in ADR form, both the ADRs and the deposited securities must be registered"); (JA722 (NYSE AMEX Sample Listing Application for American Depositary Receipts) (stating that company is listing "securities underlying American depositary shares ... solely for the purpose of effecting registration under the Securities Exchange Act of 1934, and will not give rise to the direct trading of such shares")); *accord Vivendi*, 765 F. Supp. 2d at 528.

[12]    For these reasons, Plaintiffs' effort to distinguish UBS from other issuers, on the ground that UBS uses global registered shares as opposed to ADRs (Plaintiffs' Br. at 84-86), is meaningless.  In all events, there is nothing in *Morrison* suggesting that the Court's holding turned on the difference between listing ADRs and listing ordinary shares.  *See Deutsche Bank*, 2013 WL 1223844, at *2 n.2 (rejecting "listing" theory where company directly listed its shares in the United States).

registered in the United States." *SEC Study* at 66. Accordingly, the SEC recognized that "an investor in a cross-listed security cannot maintain a Section 10(b) cause of action if he or she purchased or sold the security on the foreign exchange." *Id.* at 29.

Thus, if the Supreme Court intended Section 10(b) to apply to the purchase on foreign exchanges of cross-listed securities, it would have *reversed* the Second Circuit's decision and reinstated the *Morrison* plaintiffs' claims. *See Local 144 Nursing Home Pension Fund* v. *Demisay*, 508 U.S. 581, 591 n.4 (1993) (purported "reasoning" of a precedent is entitled to little weight when it is "contradicted by the very holding of the case in which it was pronounced").

### 2. Plaintiffs' "Listing" Theory Ignores *Morrison*'s Reasoning.

As Judge Sullivan recognized, Plaintiffs' "hyper-technical parsing of the opinion" is "in stark tension with the language of the opinion as a whole." (SPA5.) The "listing" sentence on which Plaintiffs rest their theory—that Section 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities," *Morrison*, 130 S. Ct. at 2884—merely "tracks that of the statute, which speaks of 'any security registered on a national securities exchange.'" *In re Alstom Securities Litigation*, 741 F. Supp. 2d 469, 473 (S.D.N.Y. 2010) (Marrero, J.). By its terms, this sentence reflects that Section 10(b) covers only two types of transactions: (1) those conducted "upon securities

exchanges," and (2) those conducted "over-the-counter," *Morrison*, 130 S. Ct. at 2882.[13]

   If there were any doubt, *Morrison* makes clear that the Supreme Court's concern was with the "location of the securities *transaction* and not the location of an exchange where the security may be dually listed" (SPA6):

- "[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 130 S. Ct. at 2884;

- "[W]e reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," *id.* at 2885;

- Section 30(a)'s "explicit provision for a specific extraterritorial application[,] would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges," *id.* at 2883.

In the context of the presumption against extraterritoriality, the Court clearly contemplated that "the transactions [covered by Section 10(b)] must *occur* on a domestic exchange." *Alstom*, 741 F. Supp. 2d at 473.

---

[13] Plaintiffs try to support their "listing" theory by quoting from Justice Stevens' concurrence, which characterized the Court's transactional test as barring claims "whenever the relevant securities were purchased or sold abroad *and* are not listed on a domestic exchange." (Plaintiffs' Br. at 83 (quoting *Morrison*, 130 S. Ct. at 2894).) But the Court did not adopt such a formulation of its transactional test.

Plaintiffs maintain that the presumption of extraterritoriality does not apply to their purchases of UBS shares outside the United States, because the *Morrison* Court considered "Section 10(b) … ambiguous as to whether it applies to purchases of securities that are not registered on a U.S. exchange or traded in the U.S." (Plaintiffs' Br. at 79, 84.) But *Morrison* did not consult the presumption against extraterritoriality because of any "ambiguity" in the statute; rather, the Supreme Court did so in deference to the "longstanding principle of American law that legislation of Congress, *unless a contrary intent appears*, is meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 130 S. Ct. at 2877 (quotation omitted; emphasis added). Because "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," the Supreme Court concluded that "it does not." *Id.* at 2883.

Judge Sullivan also correctly rejected Plaintiffs' argument that Congress intended to regulate "domestic matters" by allegedly making Section 10(b) apply to overseas transactions, because "Congress was legislating to prohibit specific conduct by issuers (foreign or domestic) who voluntarily list their shares for trading on U.S. exchanges." (Plaintiffs' Br. at 84.) Plaintiffs' argument ignores that "the focus of the Exchange Act is … upon purchases and sales of securities in the United States." *Morrison*, 130 S. Ct. at 2884. "Those purchase-and-sale transactions are the objects of the statute's solicitude." *Id.* "It is those

-37-

*transactions*"—not the act of listing—"that the statute seeks to regulate:  it is parties or prospective parties to those transactions that the statute seeks to protec[t]."  *Id.* (quotations omitted; alteration in original; emphasis added).[14]

### 3. Plaintiffs' "Listing" Theory Ignores the *Morrison* Court's Expressed Policy Concerns.

As Judge Sullivan held, Plaintiffs' "listing" theory "cannot be harmonized with the *Morrison* Court's clear intention to limit the extraterritorial reach of § 10(b)."  (SPA6.)  The Supreme Court's stated policy objective of avoiding "the probability of incompatibility with the applicable laws of other countries" (SPA6 (quoting *Morrison*, 130 S. Ct. at 2885)), would be undermined entirely if plaintiffs could bring U.S.-style "worldwide" class actions against non-U.S. issuers that register a class of stock on a U.S. exchange.  The Court—citing

---

[14]    Contrary to Plaintiffs' argument (Plaintiffs' Br. at 82 n.34), the Supreme Court's criticism of *Schoenbaum* v. *Firstbrook*, 405 F.2d 200, 208 (2d Cir. 1968), confirms that *Morrison* does not support their "listing" theory.  In *Schoenbaum*, a U.S. shareholder of a Canadian corporation with ordinary shares that were traded on both the American Stock Exchange and the Toronto Stock Exchange brought suit under Section 10(b) based on purchases of the corporation's shares by its parent companies outside the United States.  405 F.2d at 204-05.  In reversing the district court's dismissal of the claims, this Court held that the district court had subject matter jurisdiction because "the transactions involve stock registered and listed on a national securities exchange."  *Id.* at 208.  If *Morrison* allowed claims to be brought based on foreign purchases of cross-listed shares, then the Supreme Court would have *praised* the *Schoenbaum* opinion rather than denigrating it for "excis[ing] the presumption against extraterritoriality from the jurisprudence of § 10(b)."  *Morrison*, 130 S. Ct. at 2878-79.

-38-

the *amici* submissions of foreign governments and trade organizations, including the Swiss government—observed that "the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters." *Morrison*, 130 S. Ct. at 2885; *see also Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664, 1668 (2013) (presumption against extraterritoriality reflects the "weighty concern[]" with "protect[ing] against unintended clashes between our laws and those of other nations").

Plaintiffs do not contest that their "listing" theory cannot be reconciled with *Morrison*'s policy considerations. Rather, ignoring the NYSE's *amicus* brief submitted below, Brief of *Amicus Curiae* NYSE Euronext, 07 Civ. 11225 (S.D.N.Y. Sept. 13, 2010) (ECF No. 158), Plaintiffs try to downplay the impact of adopting the "listing" theory, claiming that "[t]here are few companies that have dually listed their shares and, thus, would be subject to the reach of Section 10(b) for transactions on non-domestic exchanges." (Plaintiffs' Br. at 86.) To the contrary, in addition to UBS, hundreds of non-U.S. issuers currently list their ordinary shares (*e.g.*, Royal Bank of Canada, Deutsche Bank) or ADRs (*e.g.*, Alcatel-Lucent, Royal Bank of Scotland) on both a foreign exchange and a U.S. exchange. (JA669-92.)

**C.     The District Court Correctly Dismissed Plaintiff Oregon's Foreign-Squared Claims.**

In the alternative, Plaintiff Oregon contends that its placement of a domestic "buy order" saves its "foreign-squared" claims. But, as this Court explained in *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, the location of the buy order is irrelevant under *Morrison*; rather, it is the place where "irrevocable liability" was incurred that controls. 677 F.3d 60, 62 (2d Cir. 2012).

The question presented in *Absolute Activist* was "whether foreign funds' purchases and sales of securities issued by U.S. companies brokered through a U.S. broker-dealer constitute 'domestic transactions' pursuant to [*Morrison*]." 677 F.3d at 62. This Court held that a transaction was "domestic" under *Morrison* when "irrevocable liability was incurred" or "title was transferred" in the United States, *id*., and remanded for determination of that issue. The Court thus posed, but did not answer, the relevant question here: *where* did Oregon incur "irrevocable liability" for its purchases of UBS shares on the Swiss Exchange.[15]

Plaintiffs' contention that the mere placement of a "buy order" with a U.S. broker in the United States is sufficient to incur irrevocable liability without that order also being executed in the United States ignores basic principles of

---

[15]     Oregon does not contend that title to these shares was transferred in the United States. (*See generally* Plaintiffs' Br. at 87-89.)

-40-

contract law.  Absent execution of the trade on the foreign exchange, there is no liability.  *See*, *e.g.*, *Intercontinental Planning, Ltd.* v. *Daystrom, Inc.*, 24 N.Y.2d 372, 382 (1969) ("A contract was deemed made in the State where the last act necessary to make it binding takes place according to the law of contracts.").

Because "the mere act of electronically transmitting a purchase order from within the United States" is not sufficient to take the purchase "outside [the *Morrison*] rule," *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010) (Koeltl, J.), Judge Sullivan correctly joined every other court to consider this question in dismissing Oregon's foreign-squared claims.  *See, e.g.*, *Satyam*, 2013 WL 28053, at *16-17 (rejecting the argument that merely placing domestic "buy order" constitutes a "domestic transaction" under *Morrison* because "[a]n investor's location in the United States does not transform an otherwise foreign transaction into a domestic one").[16]

---

[16]     *Accord In re Sanofi-Aventis Sec. Litig.*, 2013 WL 1149672, at *7-8 (S.D.N.Y. Mar. 20, 2013) (Daniels, J.) (rejecting foreign-squared claims under *Morrison*); *In re Societe Generale Sec. Litig.*, 2010 WL 3910286, at *5-6; *Cornwell* v. *Credit Suisse Grp*., 729 F. Supp. 2d 620, 624-27 (S.D.N.Y. 2010) (Marrero, J.); *Phelps* v. *Stomber*, 883 F. Supp. 2d 188, 206-07 (D.D.C. 2012); *Stackhouse* v. *Toyota Motor Co*., 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010).  *Adams* v. *Dick*, inexplicably relied on by Plaintiffs (Br. at 88), is in full accord.  226 Mass. 46, 52 (1917) (buy order in Boston led to transaction "on the [NYSE]").

\*    \*    \*

When all is said and done, it speaks volumes that *every* federal judge to consider Plaintiffs' proposed end-runs of *Morrison*—11 to date—has rejected them.  *See supra* n.6.  This Court should affirm Judge Sullivan's dismissal of all claims based on Plaintiffs' purchases of UBS shares outside the United States.

## II.   THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIMS REGARDING UBS'S POSITIONS IN AAA-RATED MORTGAGE-RELATED SECURITIES.

The Complaint's theory of fraud with respect to the UBS Investment Bank's positions in mortgage-related securities rests on the legally implausible premise that UBS executives "secretly" caused UBS to accumulate a "gargantuan" position in what they knew were "overvalued" and risky mortgage-related securities.  From that implausible premise, Plaintiffs allege that UBS committed securities fraud by luring investors into purchasing UBS shares by misrepresenting the value of those securities ("Valuation Statements") and by promising generally to avoid "undue" concentrations of risk ("Risk Statements").  (*See* Plaintiffs' Br. at 6-18, 55-76.)

Even though during the financial crisis most of UBS's peer banks suffered similar writedowns in mortgage-related securities and corresponding share price declines, Plaintiffs try to prop up their implausible "fraud" theory through selective quotations and mischaracterizations of UBS's own public disclosures.

-42-

Thus, 88 paragraphs of the Complaint cite to UBS's April 2008 Shareholder Report, which detailed, with the benefit of hindsight, the many causes of the mortgage-related writedowns UBS recognized through the end of 2007, including multiple management errors that, in retrospect, led to those writedowns. (*See*, *e.g.*, JA96 ¶ 45; 106 ¶¶ 81-82; 133 ¶ 161; 448 ¶¶ 1015-16.)

To try to revive their flawed Complaint, Plaintiffs complain that Judge Sullivan resolved factual issues in favor of Defendants and took apart Plaintiffs' scienter allegations one-by-one instead of considering them as a whole. (Plaintiffs' Br. at 62.) But Judge Sullivan did no such thing. As required by this Court's decisions, Judge Sullivan properly considered the UBS disclosures incorporated in the Complaint in their "entirety," including the portions of those documents ignored by the Complaint that contradict Plaintiffs' allegations.[17] As Judge Sullivan expressly stated, he "examin[ed] *the entirety* of Plaintiffs' scienter allegations." (SPA34 (emphasis added).) He then considered those allegations holistically within the broader context of the financial crisis, which Plaintiffs

---

[17]    *See I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991) (plaintiffs may not "evade a properly argued motion to dismiss" by requesting that court ignore entire content of document "integral to the complaint," even though "complaint contains only 'limited quotation[s]' from that document").

-43-

studiously ignore, in concluding that Plaintiffs' suicide theory of scienter did not satisfy the Reform Act's heightened pleading standards.  (*Id.*)

As Judge Sullivan properly concluded, while the Complaint's allegations, liberally construed, may suggest that UBS "made a series of bad bets" on mortgage-related securities, those allegations "are insufficient to … support a claim for securities fraud."  (SPA34.)  Applying settled law, this Court should reject Plaintiffs' effort to second-guess the UBS Defendants' decisions before and during the financial crisis.  As Judge Sullivan held, Plaintiffs' lengthy allegations, viewed "in their entirety," add up to nothing more than the inactionable theory that UBS never should have invested in AAA-rated mortgage-related securities that turned out to be high-risk, became illiquid, and lost value.  *See Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("It is well settled that section 10(b) was not designed to regulate corporate mismanagement.").

### A.    The District Court Properly Dismissed Plaintiffs' Exchange Act Claims, Because Plaintiffs Did Not Satisfy Their Burden To Plead Scienter.

The heart of any securities fraud case is scienter—"a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319.  In determining if Plaintiffs have met their burden of pleading scienter, this Court:

> must engage in a comparative evaluation; it must consider, not only
> inferences urged by the plaintiff, ... but also competing inferences
> rationally drawn from the facts alleged.  An inference of fraudulent

intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Id.* at 314.

Plaintiffs may establish a "strong inference" of scienter only by pleading particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

To plead scienter based on "conscious recklessness," a plaintiff must show that a defendant's conduct was "highly unreasonable and ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). "Conscious recklessness" is "a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *S. Cherry St.*, 573 F.3d at 109 (emphasis added). As this Court has emphasized, "poor business judgment is not actionable under section 10(b) and Rule 10b-5." *Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

Finally, following *Janus Capital Group, Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296 (2011), Plaintiffs may not rely on "group pleading," as

-45-

the Complaint purports to do (JA129-31), but must "state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." (SPA20 (quotations omitted).) *See also Fezzani* v. *Bear, Stearns & Co.*, 2013 WL 1876534, at *4 (2d Cir. May 7, 2013) ("[O]nly the person who communicates the misrepresentation is liable in private actions under Section 10(b).").

### 1.    Plaintiffs Allege No Cognizable Motive for the Alleged Fraud.

As Judge Sullivan held (SPA23-24), and Plaintiffs all but concede on appeal, Plaintiffs allege no cognizable "motive" for the UBS Defendants to commit fraud. *See Kalnit* v. *Eichler*, 85 F. Supp. 2d 232, 243 (S.D.N.Y. 1999) (Scheindlin, J.) ("There is no allegation of any insider trading by any of the defendants, nor is there any allegation of pecuniary gain ... [Second Circuit precedent] does not permit mere conclusory allegations of motive."), *aff'd*, 264 F.3d 131 (2d Cir. 2001).

On appeal, Plaintiffs' sole argument is that "Appellees and UBS traders were motivated by UBS's compensation structure to assume large concentrations of RMBS/CDOs." (Plaintiffs' Br. at 78.) But none of the UBS senior executives responsible for the Complaint's challenged disclosures was a trader, and Plaintiffs ignore that UBS compensated those executives in restricted UBS shares that they could not sell for at least four years. (*See* JA1831 n.4.) Thus, these Defendants had "no personal interest sufficient to establish motive,"

-46-

because, like other shareholders, they would have "shared the pain when [the IB's investments] failed." *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004).

In any event, this Court has squarely held that motives to "sustain the appearance of [UBS's] profitability or the success of [its investments in mortgage-related securities]" and "maintain a high stock price in order to increase [UBS] executive compensation," *S. Cherry St.*, 573 F.3d at 109, are "possessed by virtually all corporate insiders" and, thus, are insufficient to plead scienter. *Id.* If such allegations *were* a sufficient basis for pleading scienter, then "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54.

## 2. Plaintiffs' Scienter Theory Defies Economic Logic.

Because Plaintiffs did not plead any cognizable motive for the UBS Defendants to commit fraud, Plaintiffs must "produce a stronger inference of recklessness." *Kalnit*, 264 F.3d at 143; *see also Chill*, 101 F.3d at 270 (stressing the "significant burden on the plaintiff in stating a fraud claim based on recklessness"). But in attempting to plead scienter on that heightened basis, Plaintiffs ignore that the UBS Defendants were incentivized *not* to embark on a "secret" (Plaintiffs' Br. at 2) accumulation of overvalued and high-risk securities.

*First*, as Judge Sullivan held, Plaintiffs' scienter theory "defies not only economic reason but also common sense." (SPA24.) Tellingly, Plaintiffs

-47-

never explain *why* the Individual Defendants would allow UBS "to accumulate additional billions of dollars in overvalued mortgage-related securities" without "tak[ing] massive short positions on their mortgage-related securities portfolio" (*id.*) after allegedly learning *as early as June 2005* that UBS's mortgage-related securities were overvalued (JA432-33 ¶ 963).   Other, more prescient financial institutions did just that.  (*E.g.*, JA1370-74; 1377-81.)

Such irrational behavior undercuts any inference of scienter.  *See JP Morgan*, 553 F.3d at 203 (dismissing for failure to plead scienter claim that JPMC misrepresented its loans to Enron, because plaintiffs "fail[ed] to allege facts explaining why, if it was aware of Enron's problems, [JPMC] would have continued to lend Enron billions of dollars"); *Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d 501, 525 (S.D.N.Y. 2005) (Haight, J.) (granting motion to dismiss where "[t]his [alleged conduct] is a recipe for economic disaster, which in fact came to pass, and is inconsistent with hopes for or expectations of increased bonuses"), *aff'd*, 157 F. App'x 398 (2d Cir. 2005).

Highlighting the illogic of their "fraud" theory, Plaintiffs also never explain why the Individual Defendants would have caused UBS (i) to repurchase its shares in 2006 and 2007 at a "knowingly inflated" average price of $59.17 per share, and then (ii) after having written down its mortgage-related securities, to sell those shares in the Rights Offering at the lower price of $20.59 per share.  (*See*,

-48-

*e.g.*, JA1556; 1644-45; 1877-78.)   This course of conduct further negates any inference of scienter here.  *See McNamara* v. *Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 717-18 (10th Cir. 2006) (holding that, while the "Consolidated Complaint raises some serious 'red flags' ... it is lacking in allegations demonstrating [defendant's] alleged fraud was economically logical in light of [its] repurchase of its own stock at allegedly inflated prices").

*Second*, Plaintiffs cannot explain why, if UBS was trying to defraud its investors by secretly accumulating a large position in toxic mortgage-related securities, UBS expressly disclosed that it was "seeking to expand fixed income business further by pursuing opportunities in … asset-backed securities."  *See supra* pp. 10-11.  Indeed, the Complaint alleges that in the first three quarters of 2006 alone, UBS's investment in subprime mortgage-related securities was "immediately apparent" (JA178 ¶ 307), and that UBS's balance sheet reflected increases in UBS's "debt instruments, which included RMBS and super senior CDO tranches" of CHF 5 billion, CHF 69 billion, and CHF 50 billion, respectively, all "mainly due to higher positions in commercial paper and asset-backed securities."  (JA178-79 ¶ 307; *see also* SPA27 (citing (JA1548-61).)

And, even if the Defendants had wanted to hide the UBS Investment Bank's massive accumulation of mortgage-related securities, Plaintiffs offer no plausible explanation of how UBS would have been able to do so.  *See Shields* v.

-49-

*Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (holding that, absent allegations showing that defendants had reason to commit a short-term fraud, "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning").

      *Third*, Plaintiffs never explain UBS's "willingness to issue a steady stream of [increasingly negative disclosures] ... as more information became available" about the value and risk of its mortgage-related holdings. *In re PXRE Grp. Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009) (Sullivan, J.), *aff'd sub nom. Condra* v. *PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009). UBS's *early* profit warnings beginning in August 2007 and subsequent disclosures about the value and riskiness of its positions in mortgage-related securities, *see supra* pp. 15-18, "belie" Plaintiffs' scienter theory. *Id.*; *see also Rombach*, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file [the company's] financial statements.").

    **3.**    **Under *Tellabs*, the "More Compelling" Inference Is that UBS Did *Not* Foresee the Market Collapse that Caused Unprecedented Losses in UBS's AAA-Rated Mortgage-Related Securities.**

      Beyond advancing a facially implausible scienter theory, Plaintiffs have not pled "an inference of scienter *at least as likely as* [the] plausible opposing inference," as they must to survive a motion to dismiss under *Tellabs*. 551 U.S. at

314, 328.  Here, by any measure, the more "compelling" and "cogent" inference from the Complaint's allegations, *id.*, is that UBS—like regulators and other major financial institutions (*see* JA1063-64; 1386; 1619; 1629; 1179-368)—"simply did not anticipate there would be a market-wide downturn impacting its various businesses and, ultimately, UBS's shareholders."  (SPA34.)

        This Court and lower courts in this Circuit have long recognized that allegations of "fraud" accusing defendants of not predicting an unexpected and widespread occurrence, particularly a marketwide downturn, do not plead the required strong inference of scienter.  *See*, *e.g.*, *Shields*, 25 F.3d at 1129 (dismissing claim that defendants knew company's loan portfolio was "precarious" prior to the "erosion of the real estate market"); *In re PXRE*, 600 F. Supp. 2d at 533-34 ("[T]he more compelling inference .... is that Defendants, in *an unprecedented and uncertain situation*, simply lacked the software and internal mechanisms to calculate accurately the full extent of losses incurred by the three hurricanes[.]") (emphasis added); *Ciresi*, 782 F. Supp. at 821 (dismissing securities fraud case, which was "not the only case of its kind pending against a major bank" in the wake of industry-wide "financial problems," but sought "to penalize [a] banking institution[] for failing to show greater clairvoyance" (quotations omitted)), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (affirming

dismissal of securities fraud case where plaintiffs failed to point to "information showing that the primary cause of the bonds' poor performance was *not* the general weakness in the [relevant] market"); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases[.]" (quotations omitted)); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (same).

Following the financial crisis, this Court has recognized that a claim for securities fraud will not survive where, as here, "[t]he Complaint's allegations, taken collectively, reveal a company attempting to increase its share of the [relevant] market during significant financial turmoil [in 2007 and 2008]," because "[t]he more compelling inference is that Defendants' aggressive growth strategy was *sideswiped by the [market] collapse*." *Local 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011) (emphasis added); *see also Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 2012 WL 6621391, at *6 (2d Cir. Dec. 20, 2012) (rejecting an inference of scienter where defendants could not have predicted "the imminent detrimental effect that ... weaknesses [in that business] would have on the company's stock price *once the financial markets collapsed*") (emphasis added).

-52-

Like Judge Sullivan, other judges in this Circuit have dismissed securities fraud claims arising from losses incurred during the financial crisis, because the stronger inference is that defendants did not foresee the scope of the marketwide downturn.  *See Brecher*, 797 F. Supp. 2d at 371 (dismissing claims concerning Citigroup's losses in mortgage-related securities as "more likely attributable to the financial turmoil occurring in 2007 than to fraud or recklessness"); *accord In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349, 368 (S.D.N.Y. 2011) (Sullivan, J.); *Woodward* v. *Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (Patterson, J.); *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) (Batts, J.); *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (Pauley, J.); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) (Swain, J.); (JA1094-95 (collecting cases)).

Applying this settled law, Judge Sullivan correctly concluded that UBS's writedowns of its previously AAA-rated mortgage-related securities, "based on the facts as they are alleged in the [C]omplaint," were "more likely attributable to the financial turmoil occurring in 2007 than to fraud or recklessness."  (SPA34.) "[A] series of bad bets" does not "establish scienter [or] support a claim for

securities fraud." (*Id.*) *See Rothman*, 220 F.3d at 90 ("poor business judgment" not actionable).

### 4. Plaintiffs' Disparate Allegations Do Not Establish the Requisite "Cogent" or "Compelling" Inference of Scienter.

There is no basis for Plaintiffs' repeated accusation that Judge Sullivan did not read the Complaint "holistically" (Plaintiffs' Br. at 64, 69, 78), in concluding that Plaintiffs had failed to plead the required "cogent" or "compelling" strong inference of scienter. As Judge Sullivan expressly stated, he "examin[ed] the *entirety* of Plaintiffs' scienter allegations" (SPA34 (emphasis added)), and it is a perversion of his opinion for Plaintiffs to suggest that his thorough analysis of each of their allegations meant that he considered those allegations only in isolation. Indeed, it is Plaintiffs who ignore the big picture, *i.e.*, the unforeseen market collapse in what were AAA-rated securities, and Plaintiffs' allegations, taken "holistically" as required by *Tellabs*, cannot overcome this fatal deficiency.

#### a. The Purported "Red Flags" Concerning UBS's Valuation of Its Mortgage-Related Securities Do Not Plead a Strong Inference of Scienter as to the "Valuation Statements."

In claiming that the District Court erred in holding that their Complaint did not plead the required "strong inference" of scienter in connection with UBS's disclosures of the "fair value" of its mortgage-related securities, Plaintiffs cite a litany of so-called "red flags" that supposedly "demonstrat[e] that

-54-

UBS's mortgage-related asset portfolio was materially impaired" before UBS recognized such an impairment. (Plaintiffs' Br. at 67-74.)[18]

But, in throwing up irrelevant smoke-screen after irrelevant smoke-screen, Plaintiffs fatally:

- do not plead that the UBS Investment Bank's AAA-rated securities were trading below par value, like lower-rated securities (JA148-51), when the challenged statements were made, that is, prior to what the Complaint acknowledges was the market's "severe[] dislocat[ion] in the summer of 2007" (JA181 ¶ 314);

- point to selective quotations from the UBS Shareholder Report, which stated that UBS senior management expressed general "concern about the decline in the U.S. mortgage market" (Plaintiffs' Br. at 70), while ignoring that the same report goes on to say that "Senior Management only appreciated the severity of the problem in *late July 2007*" (JA1471 (emphasis added)); and

- ignore that, at the time of the alleged misstatements, (i) Federal Reserve Chairman Ben Bernanke stated that any "weakness [in the subprime market] has been contained," and (ii) the IMF concluded

---

[18]    On appeal, Plaintiffs abandon their leading valuation-related "red flag," a confidential witness's June 22, *2005* letter, based on which Plaintiffs had argued that UBS knew mortgage-related securities were impaired before UBS even bought them. (JA3321-22.) The District Court properly rejected this allegation because of the "lapse in time between [the 2005 letter] and the absence of any corresponding decline in market value" of UBS's mortgage-related securities, and the fact that the allegation showed nothing more than a different business judgment. (SPA27.)

that this weakness was "not likely to pose a systemic threat," and "most investors with exposure to subprime mortgages through securitized structures will not face losses." (JA1619; 1629.)

### i. Internal Testing of DRCM's Lower-Rated Securities and DRCM's Closure

On appeal, Plaintiffs' principal "red flag" relates to internal "tests" by DRCM employees in *early 2007* purportedly revealing that *DRCM*'s lower-rated mortgage-related securities had begun to decline in value, leading to writedowns on those securities and eventually DRCM's closure. (*See* JA436-37; Plaintiffs' Br. at 16-17, 67-68, 70.) Plaintiffs make the unsupported assertion that UBS should have "extrapolated" from these DRCM losses to mark down the UBS Investment Bank's *AAA-rated* securities sooner than it did. (Plaintiffs' Br. at 16, 68.) As the District Court recognized, the DRCM "tests" do not support a "strong inference" of scienter, because Plaintiffs "fail[] to tie the test[s] and DRCM's resulting spring 2007 writedowns of its *low-grade* mortgage related securities to the alleged failure to make sufficient disclosures with regard to UBS's *high-grade* AAA-rated securities." (SPA28.)

Plaintiffs simply ignore the disclosed differences between the mortgage-related securities in which DRCM and UBS's Investment Bank invested.

As explained in the Shareholder Report and other UBS disclosures integral to the Complaint:[19]

- "DRCM's losses in first quarter 2007 arose largely on lower-rated tranches of residential MBS, whereas the *IB generally had short positions in these rating bands*, on which it had recorded gains in the quarter" and "positions in the more senior parts of the capital structure of CDOs, which were highly rated."    (JA1496 (Shareholder Report) (emphasis added).)

- "DRCM took write-downs on the ABS Relative Value strategy's home equity book in Q1 2007 ... substantially in the *lower credit quality ABS* and NIMs (*i.e.* rated BB+ and below)."  (JA1448 (Shareholder Report) (emphasis added).)

- "DRCM losses were often in asset classes that were *rated lower than Subprime positions in the IB*[.]"    (JA1469 (Shareholder Report) (emphasis added).)

- "In first quarter 2007, DRCM sustained losses on ... illiquid, *primarily low-rated, sub-prime securities*[.]"  (JA1494 (Ethos Answers) (emphasis added).)

---

[19]    In addition to the Shareholder Report, Plaintiffs' brief and Complaint also selectively quote from a February 2008 disclosure publishing UBS's responses to questions from shareholders concerning the deterioration of UBS's mortgage-related securities (JA1488-1513) ("Ethos Answers").

Plaintiffs have no basis for their conclusory claim that "DRCM and the IB both invested *in the same* (i) RMBS and (ii) mezzanine CDOs." (Plaintiffs' Br. at 72 (emphasis added).)[20]

Alternatively, Plaintiffs maintain that even if DRCM's lower-rated securities and the Investment Bank's AAA-rated securities were not "the same" (*id.*), a portion of the IB's AAA-rated portfolio consisted of AAA super senior tranches of mezzanine CDOs "collateralized by ... the same assets purportedly held by DRCM," *i.e.*, BBB-rated RMBS and, thus, "warranted a similar valuation" (*id.* at 73).[21] But this argument ignores the most important characteristics of these securities—their structure and subordination. As the Complaint itself recognizes, the highest "tranche" of the CDO carried the *least* risk (and, concomitantly, earned the lowest yield), because that tranche would suffer losses only if "all other tranches ... were fully exhausted." (JA139 ¶¶ 178-79.)

---

[20]     Similarly, Plaintiffs' unsupported allegation that the UBS IB "replicated the proprietary trading strategies of [DRCM]" (Plaintiffs' Br. at 72) is contradicted by the very documents on which Plaintiffs rely to bring their claims. (JA1496 (Ethos Answers) ("DRCM's losses in first quarter 2007 arose largely on lower rated tranches of residential MBS, whereas the IB generally had short positions in these rating bands, on which it had recorded gains in the quarter.").)

[21]     Contrary to Plaintiffs' claim that UBS "held at least $50 billion in super senior tranches of subprime-backed mezzanine CDOs" (Plaintiffs' Br. at 13), less than $27 billion of the UBS IB's $50 billion in super senior CDOs constituted its "Mezz[anine] ABS CDO inventory" (JA1451 (Shareholder Report)).

In short, Plaintiffs' apples-to-oranges comparison between DRCM's internal tests involving its *lower-rated* RMBS and the value of UBS Investment Bank's *AAA-rated* mezzanine CDO tranches ignores "large valuation differences between highly and poorly rated [mortgage-related] securities" and, thus, falls far short of the "specific[]" allegations of reckless disregard of "information contradicting [the UBS Defendants'] public statements" required to plead scienter. *Lighthouse Fin. Grp.* v. *Royal Bank of Scot. Grp.*, 2012 WL 4616958 at *8-9 (S.D.N.Y. Sept. 28, 2012) (Daniels, J.) (dismissing claims involving RBS's mortgage-related securities on scienter grounds); (SPA25 (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000))).[22]

Moreover, as Judge Sullivan recognized, UBS, immediately upon learning of the DRCM writedowns based on DRCM's internal tests and "far from trying to conceal any alleged losses, … actually began reviewing the valuation and risk management practices connected to its higher-rated securities."  (SPA28.)

---

[22]    Indeed, the cases on which Plaintiffs rely (Plaintiffs' Br. at 68) demonstrate the weakness of their allegations.  *See*, *e.g.*, *In re Bear Stearns Co. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 501-505 (S.D.N.Y. 2011) (Sweet, J.) (competing inference about the unpredictable marketwide downturn could not overcome the inference of scienter where the *SEC expressly told* Bear Stearns that its models for valuing mortgage-related assets and their risks were "flawed"); *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 378 n.2, 388, 390 (S.D.N.Y. 2011) (Batts, J.) (SEC had "raised detailed questions" expressing "concern[] about the valuation of [Morgan Stanley's] subprime securities").

This UBS review supports a "strong inference" of prudent management, not fraud. *See Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation as soon as [defendants] learned that the [company's] investment-grade CDOs might be deteriorating ... was a prudent course of action that weakens rather than strengthens an inference of scienter." (quotations omitted)).[23]

### ii.    Declines in the Lower-Rated Tranches of the ABX Index

On appeal, Plaintiffs claim that declines in the ABX index were another "red flag" supposedly supporting a strong inference of scienter. (Plaintiffs' Br. at 70, 73.)  But, by not making this argument below, Plaintiffs waived it.  *See Millea* v. *Metro-North R.R. Co.*, 658 F.3d 154, 163 (2d Cir. 2011) ("Arguments raised for the first time on appeal are deemed waived.").[24]

In any event, the ABX declines Plaintiffs cite merely reflect that certain lower-rated tranches of mortgage-related securities referenced in the index

---

[23]    In addition, the District Court properly did not credit Plaintiffs' "conclusory allegation" that payments to DRCM's OIF investors upon the termination of the fund were intended to "conceal" losses in UBS's mortgage-related securities. (SPA29; Plaintiffs' Br. at 70.)

[24]    In discussing scienter below, Plaintiffs mentioned the ABX Index only in passing, arguing that UBS's analysts reported risks related to declines in the index in September 2006.  (JA3322-33 n.41.)  On appeal, by contrast, Plaintiffs maintain that ABX Index declines are *themselves* "red flags" demonstrating fraud in connection with the valuation of UBS's mortgage-related securities.  (*See* Plaintiffs' Br. at 69-70.)

traded below par during the first quarter of 2007. (JA148-51.) *See Lighthouse*, 2012 WL 4616958, at *3, *8 (dismissing claims related to RBS's mortgage-related securities, including $3.2 billion in CDO holdings, because the "ABX indices for A- and BBB-rated RMBS" do not establish scienter with regard to more highly-rated securities); *Wachovia*, 753 F. Supp. 2d at 364 (no scienter where plaintiffs did not show that "ABX/TABX indices ... determined the value of [those particular CDOs]").[25]

Moreover, Plaintiffs' claim that UBS should have marked down the Investment Bank's AAA-rated super senior holdings based on a decline in the BBB-rated tranche of the ABX index is undermined by their inability to allege that *any* financial institution marked down these AAA-rated assets—whether RMBS or CDO tranches—*prior to the third quarter of 2007*. (*See* JA404 ¶ 888 (alleging that Merrill Lynch wrote down its mezzanine CDO positions on October 26, 2007).)

---

[25] The district court cases that Plaintiffs cite (Plaintiffs' Br. at 70-71) are inapposite. In *In re Citigroup Inc. Securities Litigation*, the court cited declines in the ABX Index to support an inference of scienter *only* with respect to a single defendant's misstatements concerning the value of Citigroup's CDOs *after* November 2007, which postdated the marketwide downturn and substantial declines in all tranches of the indices. 753 F. Supp. 2d 206, 240-41 (S.D.N.Y. 2010) (Stein, J.). In *Stratte-McClure*, the court (in dicta) opined that plaintiffs might have alleged scienter based on a decline in the ABX Index, where Morgan Stanley referred to it as "[o]ne of the key proxies" for valuing the securities at issue. 784 F. Supp. 2d at 378 n.2, 388, 390.

### iii.    Analyst Reports and Internal Warnings

Finally, Plaintiffs cherry-pick from widely published UBS analyst reports regarding "the mortgage market's general decline," which Judge Sullivan correctly held did not raise a "red flag" that UBS's "AAA-rated mortgage-backed securities were also at risk."  (SPA28.)  Because such reports pertained only to an overall "downturn in the subprime mortgage industry," and not to AAA-rated securities, which were designed to withstand such a downturn, these reports do not support a strong inference of scienter.  *See Brecher*, 797 F. Supp. 2d  at 371; *Lighthouse*, 2012 WL 4616958, at *8-9 (plaintiffs "fail[ed] to tie" information about "declines in ... broad market indicators" to "specific assets RBS owned"); (JA1473 (Shareholder Report) (despite "concerns surrounding Subprime as an asset class," UBS executives believed "that deterioration in the Subprime market would not impact AAA assets" specifically)).

Similarly, so-called "warnings" from UBS employees as early as *2005* about a possible "decline in the U.S. subprime mortgage market" implied nothing about the value of the UBS Investment Bank's AAA-rated mortgage-related securities.  At most, these general warnings—such as one in late 2006 from an individual trader that the "sky is falling" (JA472 ¶ 1081)—simply reflected differing business judgments about the market's direction, and do not support a strong inference that the UBS executives responsible for the bank's disclosures

-62-

were consciously reckless in making the Valuation Statements. *See Lighthouse*, 2012 WL 4616958, at *8 (no strong inference of scienter based on single trader's contrary opinion that the valuation of "ABN AMRO's trading books were based on 'super aggressive' assumptions"); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (Lynch, J.) ("fact that other individuals within [the company] may have had views different from [defendant's]" does not establish required strong inference of scienter).[26]

### b. Plaintiffs' Allegations Related to UBS's Disclosures About Its General Risk Management Practices Do Not Raise a Strong Inference of Scienter.

Plaintiffs' theory of scienter with respect to the Risk Statements is that the Investment Bank's holdings in mortgage-related securities were "*per se*, a concentrated position." (SPA26.)  But UBS did not, as Plaintiffs claim, represent

---

[26]    Judge Sullivan correctly rejected Plaintiffs' allegations regarding UBS employee Eric Rothman, because those allegations were "taken directly from uncorroborated allegations embedded in a complaint in another action." (SPA29.) In claiming that Judge Sullivan should have credited these allegations (Plaintiffs' Br. at 69 & n.29), Plaintiffs ignore that where there has been no "adjudication[] of the underlying issues," such allegations are "immaterial" as a matter of law, and "may [not] properly be cited in the pleadings." *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976); *accord RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 403-404 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).  In any event, because these allegations simply re-hash Plaintiffs' claim that downgrades of lower-rated bonds should have caused UBS to write down its AAA-rated securities sooner, the District Court correctly held that "its analysis would not change," even if these allegations were considered. (SPA29.)

that it avoided "asset concentrations" and "concentrated positions" (Plaintiffs' Br. at 6, 56), as *such*. Rather, UBS represented that it sought to avoid concentrations of *risk*—*i.e.*, "*undue* concentrations," "*illiquid* and concentrated positions," and "*highly exotic* exposures." (JA155 ¶ 228; 311 ¶ 649; 343 ¶ 737; 346 ¶ 741; 348 ¶ 748; 356 ¶ 760; 607 (all emphasis added).) Judge Sullivan correctly held that the Complaint does not "specifically allege defendants' knowledge of facts or access to information" contradicting *these* statements. (SPA25.)

The Complaint's principal support for the necessary "strong inference" of scienter—that certain Individual Defendants[27] knew that UBS had invested billions of dollars in almost exclusively AAA-rated mortgage-related securities (Plaintiffs' Br. at 62-63)—says nothing about why these individuals subjectively would have considered these investments—which comprised, at most, "approximately 5% of [UBS's] overall portfolio" (SPA26) and which were hedged, in part, against a decline in value (JA1450)—an "undue" or "risky" concentration.[28]

---

[27]    Messrs. Jenkins, Ospel, Rohner, Standish, Stuerzinger, Suter, and Wuffli.

[28]    Plaintiffs quibble with the District Court's denominator, arguing that the relevant comparison for assessing the concentration was UBS's $610 billion trading portfolio rather than UBS's overall balance sheet. (Plaintiffs' Br. at 59-60.) Yet, in their Complaint, and even in their brief on appeal, Plaintiffs themselves use UBS's balance sheet as the relevant point of comparison. (*See id.* at 9 (UBS's practice was to avoid holding "large chunks of assets" "on [its] balance sheet"

*(footnote continued . . .)*

-64-

The "more compelling" inference to be drawn from the Complaint is just the opposite.  As explained *supra* pp. 9-12, prior to the market's "severe[] disclocat[ion] in the summer of 2007" (JA181 ¶ 314), UBS's securities shared the same AAA-rating as U.S. Treasury bonds and, thus, were viewed as "able to withstand an extreme level of stress and still meet [their] financial obligations." (JA1073 (S&P).)  As a result,  after conducting an extensive investigation into this issue, UBS's primary regulator, the SFBC, found that "UBS was not aware of the extent and the nature of its risk exposure to the Subprime mortgage and related markets until the beginning of August 2007[.]"  (JA1386.)[29]

At bottom, Plaintiffs' theory of "fraud" with respect to the Risk Statements is simply a repackaging of their theory with respect to the Valuation

---

(quoting JA350 ¶ 751)); *see also* JA1462 (Shareholder Report) (UBS monitored "growth in [its] overall balance sheet," which included but was not limited to the IB's "tradable assets").)  Plaintiffs' denominator also fails to account for the over $1.6 trillion in market positions UBS held in the form of cash, bank deposits, reverse repurchase agreements, and basic commercial loans—all of which constituted exposure to market risk.  (JA2320.)

Because Plaintiffs did not raise below their argument on appeal that the Risk Statements were "qualitative[ly]" material  (Plaintiffs' Br. at 59), this argument is waived.  *Millea*, 658 F.3d at 163.

[29]    Plaintiffs' claim that UBS's retention of super senior tranches of certain CDOs evidences scienter (Plaintiffs' Br. at 62) fails for the same reason:  because these super senior tranches were AAA-rated investments, they were widely considered to be "super safe investment[s]."  (JA1143 (quoting the Comptroller of the Currency).)

Statements. As the Complaint acknowledges, higher-rated securities had lower yields precisely because those securities were considered lower risk. (JA139 ¶¶ 178-79.) Thus, to allege that the Individual Defendants knew that the Investment Bank's AAA-rated securities were riskier than their high credit rating suggested is another way of implausibly alleging that UBS knowingly overpaid for these securities and then overvalued them on its books. And, as shown below, the Complaint's other allegations similarly do not support the required strong inference that Defendants were consciously reckless in making the Risk Statements.

### i.    Portfolio Limits

Plaintiffs claim that certain Defendants acted with scienter in making the Risk Statements, because despite representing that UBS "implemented asset portfolio limits," they were "aware that UBS had *no* portfolio limits and had amassed a $100 billion subprime portfolio." (Plaintiffs' Br. at 63-64.)[30] But, as the Shareholder Report from which this allegation is drawn makes clear, UBS limited the size of its positions based on their perceived *riskiness*, not their notional value. (*See* JA1455 (noting that UBS limited "*risks* at a portfolio level" (emphasis added)); 1465 (stating that, in addition to risk-based portfolio limits, UBS "did not

---

[30]    Plaintiffs relegated this argument to a fraction of a footnote in their opposition below. (JA3303 n.18.)

implement ... aggregate notional limits" and that "[t]hroughout 2006 and until Q3 2007, there were no aggregate notional limits on the sum of the CDO warehouse pipeline and retained CDO pipeline positions"); 1474 ("The vast majority of positions that caused the Subprime Losses were monitored under and subject to the limit structure of the Market Risk framework.").)

### ii.    Illiquidity

Plaintiffs also do not plead scienter in connection with UBS's statements about avoiding "illiquid *and* concentrated" positions.  (Plaintiffs' Br. at 56 (emphasis added).)   Plaintiffs make no specific allegation that any material amount of UBS's mortgage-related portfolio was "illiquid" prior to (i) the market's "sever[e] discloc[ation] in the summer of 2007" (JA181 ¶ 314), and (ii) UBS's August 14, 2007 warning of "reduced liquidity in subprime related securities" (JA1668).  Indeed, Plaintiffs ignore that the UBS Investment Bank accumulated a substantial portion of these AAA-rated securities *because of their safety and liquidity* and put them into a portfolio designed to "act as a liquidity buffer or reserve for the UBS Group generally."  (JA1452.)   These AAA-rated securities were "[c]apable of being sold in the short term" and could even be "pledged to (one or more of) the primary Central Banks as collateral for UBS's own borrowing."  (*Id.*)

Plaintiffs' only specific "illiquidity" allegation concerns lower-rated securities held by DRCM in early 2007 (*e.g.*, JA89 ¶ 30), which again ignores that the UBS Investment Bank's *AAA-rated* securities (i) were not shown to be trading below par value before the market's "sever[e] discloc[ation] in the summer of 2007" (JA118 ¶ 314), even though DRCM's lower-rated securities were (JA148-51), and (ii) were not rendered illiquid until "the liquidity crisis in the wider market" in late 2007 (JA1462).[31]

### iii.    Other "Warnings"

Plaintiffs also place a great deal of weight on UBS Group Treasury's supposed warnings to the UBS Group Executive Board ("GEB") and the GEB's alleged internal characterization of UBS's growth strategy as "aggressive." (*See* Plaintiffs' Br. at 63.) But these allegations derive from the UBS Shareholder Report and take selective quotations of that document out of context.

According to the UBS Shareholder Report:

---

[31]    Plaintiffs also allege that UBS retained the super senior tranches of the CDOs that it originated because those tranches were "an attractive source of profit" (JA141 ¶ 182 (quotations omitted)) and would have affected "liquidity in the market for its CDOs" as UBS was "unable to sell [those tranches] to third-party investors." (JA177 ¶¶ 303-04.) On the contrary, the super senior tranches that UBS retained were, at most, "not easily marketable to third party investors" "[d]ue to their low-yield," due, in turn, to their being  perceived by the market as "virtually risk-free." (JA734.) "The responsible persons at the CDO Desk were convinced that, if necessary, they would be able [to] sell these Super Senior CDOs … in the market on short notice." (JA742.)

-68-

- After approving the Investment Bank's "Fixed Income Growth Strategy" *in early 2006*, the GEB simply cautioned the bank to avoid "illiquid commitments that *could* result from this growth plan," an admonition consistent with the Investment Bank's accumulation of AAA-rated securities that were thought to be safe and liquid.  (JA1464 (emphasis added) (cited by JA172 ¶ 286 (cited by Plaintiffs' Br. at 63)).)

- In late 2006, Group Treasury reported to the GEB a "build up in less liquid assets" on UBS's balance sheet, while expressly distinguishing those assets from the "high level of tradable assets" which included "the IB's ABS and MBS positions."   (JA1462 (cited by JA447-48 ¶ 1014 (cited by Plaintiffs' Br. at 63)).)

- In March 2007, after the market for lower-rated securities became illiquid, Group Treasury proposed that the GEB's Risk Subcommittee adopt "a hard limit on IB illiquid assets" reflected on the balance sheet (JA1462 (cited by JA448 ¶ 1015 (cited by Plaintiffs' Br. at 63))), but Plaintiffs ignore that the Investment Bank's *AAA-rated* securities were not then considered "illiquid assets."  Rather, the prices of such securities were not impacted until the "liquidity crisis in the *wider* market," which began in the latter half of 2007.  (JA1462 (emphasis added).)

Thus, in context, the Shareholder Report *undercuts* any inference of scienter (strong or otherwise) regarding the Risk Statements, because none of the supposed "warnings" listed above concerned the UBS Investment Bank's accumulation of *AAA-rated* securities.  *See I. Meyer Pincus*, 936 F.2d at 762 (court

must consider an "entire document" cited in complaint and not "limited quotation[s]").

In short, none of Plaintiffs' allegations amounts to "information contradicting [the UBS Defendants'] public statements," *Novak*, 216 F.3d at 308, regarding "undue," "risky," or "illiquid" concentrations.

### c. None of Plaintiffs' "Additional Indicia" Raises a Strong Inference of Scienter.

Given the absence of well-pled allegations relating directly to the value or riskiness of UBS's actual mortgage-related securities holdings, Plaintiffs must fall back on even more generalized and irrelevant allegations, namely: "resignations and terminations," the "magnitude" of the writedowns, and alleged violations of accounting standards. (Plaintiffs' Br. at 77-78.) As the District Court correctly held, none of these is sufficient to plead scienter.

*First*, the termination or resignation of UBS employees involved with the Investment Bank's investments in mortgage-related securities (Plaintiffs' Br. at 18, 70, 77), not supported by "additional factual allegations" linking those departures to knowledge of the purported misstatements about UBS's mortgage-related securities, does not support a strong inference that UBS, with conscious recklessness, made those misstatements. (SPA30.) *See Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 77 (2d Cir. 2008) (resignation four months after a

company issued securities while allegedly misvaluing its assets is "insufficient to demonstrate scienter").

*Second*, the size of UBS's writedowns of mortgage-related securities is a "non-starter" in pleading scienter (SPA31), particularly where, as here, nearly every major financial institution announced large writedowns during the financial crisis.  *See Satyam*, 2013 WL 28053, at *21 ("magnitude of a[n alleged] fraud, standing alone, cannot support a strong inference of scienter.").

*Third*, the District Court correctly concluded that because Plaintiffs do not cite "identical factors" that were "operative and evident to defendants at the time of earlier incomplete public statements or reports" and "ultimately forced UBS[] to [later] writedown its *AAA-rated* securities," the timing of UBS's writedowns also cannot support a strong inference of conscious recklessness. (SPA31.)  As this Court has held, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  *Acito*, 47 F.3d at 53.

*Finally*, allegations of accounting "violations or ... irregularities ... are insufficient to state a securities fraud claim."  *Novak*, 216 F.3d at 309.  Moreover, considering that UBS's independent auditor E&Y "did not require a restatement of UBS's financials," Plaintiffs cannot plausibly claim that the UBS Defendants *intentionally* violated accounting standards.  (SPA30; JA1460.)  An auditor's

finding that a restatement is not required strongly suggests that "reasonable accountants could differ" over the application of these accounting standards, which "defeats plaintiffs' claims of recklessness" based on a supposed violation of these standards. *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, at *13 (S.D.N.Y. 2007) (Stein, J.), *aff'd sub nom. JP Morgan*, 553 F.3d at 187.

\*      \*      \*

For all these reasons, Judge Sullivan properly rejected Plaintiffs' inherently implausible theory of scienter that, at bottom, rests on dozens of vague and unsupported allegations derived from mischaracterizations of UBS's own extensive public disclosures, including the Shareholder Report. The Reform Act requires more than allegations of mistake, lack of clairvoyance, or even mismanagement. Here, as Judge Sullivan held, the far more compelling inference under *Tellabs* is that UBS's losses on its publicly announced strategy to acquire mortgage-related securities were the result of the unprecedented and unforeseen "severe[] dislocat[ion]" of the market in the summer of 2007, not fraud. (JA118 ¶ 314.)[32]

---

[32] On appeal, Plaintiffs abandon their allegations regarding Defendants Hutchins and Stehli because, as the District Court correctly held, Plaintiffs' Complaint "does not allege that either executive made any actionable misstatement." (SPA22; Plaintiffs' Br. at 55 n.23.) Plaintiffs attempt to revive their claims against Stuerzinger with respect to one alleged misstatement (Plaintiffs' Br. at 55 n.23), but they conceded otherwise "through silence" below

*(footnote continued . . .)*

-72-

**B.    Alternatively, the Complaint Does Not Plead with the Required Particularity that Any of UBS's Statements About Its Mortgage-Related Positions Were Materially Misleading.**

This Court should reject Plaintiffs' "fraud" theory for both the Risk Statements and the Valuation Statements for an additional reason:  the Complaint simply does not adequately plead the existence of a material misstatement as a matter of law.  *See* 15 U.S.C. § 78u-4(b)(1).

**1.    The Risk Statements Are Not Materially Misleading.**

The Complaint does not plead that the Risk Statements were materially misleading for at least two reasons:

*First*, in reliance on this Court's decision in *JP Morgan*, Judge Sullivan correctly held that the Risk Statements were "non-actionable puffery," because these statements are "too general to cause a reasonable investor to rely on them."  (SPA26 (quoting 553 F.3d at 206).)

On appeal, Plaintiffs misconstrue the recognized "puffery" doctrine and erroneously claim that the Risk Statements were not inactionable puffery, because (i) UBS "represented that the avoidance of asset concentrations was vital to the Company's business and success," and (ii) the statements were "knowingly

---

(SPA2).  Therefore, this claim is not preserved for appeal.  *See, e.g.*, *First Capital Asset Mgmt., Inc.* v. *Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y. 2002) (Kaplan, J.).  The claims against Mr. Stuerzinger lack merit in any event for the reasons discussed *supra* pp. 42-72.

and verifiably false at the time they were made." (Plaintiffs' Br. at 57.) But, for the reasons discussed *infra* pp. 78-83, this represents a fundamental misunderstanding of the concept of "puffery" and cannot be squared with this Court's decision in *JP Morgan*. *See* 553 F.3d at 205-06 (characterizing as puffery statements by a company that it "had risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process"); *Lemond* v. *Manzulli*, 2009 WL 1269840, at *7 (E.D.N.Y. Feb. 9, 2009) ("[G]eneralizations regarding integrity, fiscal discipline, and risk management ... amount to no more than inactionable puffery").

       *Second*, as recounted above, UBS disclosed its intent to accumulate these mortgage-related securities. *See supra* pp. 9-12. In other words, UBS's disclosures "explicitly disclosed the very [concentration] risks about which [Plaintiffs] claim to have been misled." *Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011). In the court below, Plaintiffs did not dispute the fact of these disclosures "in [their] opposition brief nor at oral argument" (SPA27), and may not do so for the first time on appeal. *Millea*, 658 F.3d at 163.

       The Complaint, moreover, affirmatively alleges that "[t]he effect on UBS's balance sheet of its frenzied investment in subprime-backed CDOs was *immediately apparent*" (JA178 ¶ 307 (emphasis added)), an allegation impossible

to square with their theory that UBS "secretly amassed" this portfolio.  (Plaintiffs'

Br. at 2.)[33]

Similarly, Plaintiffs' claim that UBS misled the market in disclosing

that it "primarily invests into opportunities that are client-driven and not into

proprietary trading."  (Plaintiffs' Br. at 8-9, 63-64.)   This argument tellingly

merited a fraction of a footnote in Plaintiffs' opposition below (JA3321 n.39), and,

given that the UBS Investment Bank's fixed income strategy was publicly

disclosed, this argument fails.  In any event, that Plaintiffs allege that UBS's

positions in mortgage-related securities amounted to 5% of UBS's balance sheet

---

[33]    For similar reasons, Plaintiffs cannot rely on the "'selective disclosure'
statements," which Plaintiffs claim did not fully disclose "[t]he [t]rue [e]xtent [o]f
UBS's [s]ubprime [e]xposure."  (Plaintiffs' Br. at 74.)  As a threshold matter,
Plaintiffs did not claim that these were "selective disclosure[s]" to the court below
and, therefore, have waived the argument.  *See Millea*, 658 F.3d at 163 (waiver).
In any event, the District Court properly concluded, based on UBS's disclosures,
that "the market already had an understanding that UBS had a large mortgage-
related securities portfolio."  (SPA26-27.)   Nor did such statements somehow
require UBS, which had already disclosed its overall "sub-prime risks" to the entire
market, to *further* disclose "in more detail" commercially sensitive information
regarding its specific investment in mortgage-related securities.  *Swiss Re*, 753 F.
Supp. 2d at 181 ("no obligation for an issuer to identify specifically every type of
asset or liability it possesses"); *Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*,
159 F.3d 723, 730-31 (2d Cir. 1998) (statements disclosing investments in
"government guaranteed mortgage-related securities" were "broad enough to cover
these instruments" even if not specifically disclosed); *San Leandro Emergency
Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 809 (2d
Cir. 1996) ("We are concerned ... about interpreting the securities laws to force
companies to give their competitors advance notice of sensitive pricing
information.").

does not render false or misleading any representation that UBS did not "primarily" engage in "proprietary trading."

### 2. Plaintiffs Do Not Allege that the UBS Defendants "Did Not Honestly Believe" the Valuation Statements.

The District Court's dismissal of Plaintiffs' claims based on the Valuation Statements also should be affirmed, because determining the "fair value" of UBS's mortgage-related securities was not a "matter[] of objective fact." *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). Beyond their citation to the wrong part of the ABX Index (*see supra* pp. 60-61), Plaintiffs do not cite any "objective standard, such as market price, that [UBS] should have but failed to use in determining the value of [these] assets." *Id.* Instead, "financial valuation models depend so heavily on the discretionary choice of the modeler—including choice of method ... choice of assumptions ... and choice of 'comparables' ... the resulting models and their predictions can only fairly be characterized as subjective opinions." *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at 251-52.

Because the Valuation Statements were not matters of "objective fact," Plaintiffs must adequately plead that the statements "were both false and not honestly believed when made." *Fait*, 655 F.3d at 113. But the Complaint contains no well-pled allegations that any of the UBS Defendants with "ultimate authority over the statement, including its content and whether and how to communicate it," *Janus*, 131 S. Ct. at 2302, did not subjectively believe the Valuation Statements at

-76-

the time they were made.  Therefore, even assuming Plaintiffs have adequately pled scienter (which they have not), their claims still fail on this alternative ground for affirmance.  *City of Omaha, NE Civilian Emps. Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) ("[E]ven if the ... complaint did plausibly plead that defendants were aware of facts that should have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim after *Fait*.").

<div align="center">*     *     *</div>

For the foregoing reasons, the District Court properly dismissed Plaintiffs' claims concerning the UBS Investment Bank's AAA-rated mortgage-related securities, because the Complaint pled neither the required "strong inference" of scienter, nor the existence of a material misstatement about those securities.

## III.   THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIMS CONCERNING UBS'S "VERY SMALL," SWISS-BASED U.S. CROSS-BORDER BUSINESS, BECAUSE THE COMPLAINT DID NOT PLEAD THAT UBS MADE ANY MATERIAL MISSTATEMENTS ABOUT THAT BUSINESS.

For the reasons set forth below, and those stated in the Underwriters' Brief at 19-54, Judge Sullivan correctly held that the alleged misstatements forming the basis of the Complaint's claims relating to the actions of certain employees in UBS's "very small" (JA2256 ¶ 8 (DPA)), Swiss-based U.S. cross-

<div align="center">-77-</div>

border business were "no more than non-actionable puffery," and that, "alternatively," after disclosing the pending U.S. government investigations of that business, "UBS had no further duty to disclose the uncharged conduct" of those employees.  (SPA35.)

### A.  As a Matter of Law, UBS's Aspirational Statements About Its *"Aim*[] To Comply" with Legal and Ethical Standards Were Non-Actionable Puffery.

It is undisputed that UBS first mentioned its small U.S. cross-border business in its public disclosures on May 9, 2008, when initially disclosing the pendency of U.S. government investigations of that business.

Without any statement about the cross-border business that could form the basis for a misstatement claim, Plaintiffs must point to UBS's statements about its aspirations for the conduct of its global business of 80,000 employees operating in 50 countries, which Plaintiffs allege were materially false and misleading in light of UBS's admitted misconduct in connection with its small cross-border business:

- UBS "*aim*[*s*] *to* comply with all applicable [regulatory] provisions";

- UBS "*want*[*s*] *to ... promote* a corporate culture that adheres to the highest ethical standards";

- UBS employees "*should* conduct themselves in a manner that is beyond reproach, as preserving our integrity is vital to our most important asset – our reputation"; and

-78-

- UBS "*fosters* [its] long-term stability" by, among other things, "*establish*[*ing*] *and control*[*ing*] UBS's corporate governance processes – including compliance with relevant regulations."

(Plaintiffs' Br. at 18-20 (emphasis added); *see also id.* at 51-52, 56 (similar alleged misstatements).)

As Judge Sullivan correctly held, in reliance on this Court's decision in *JP Morgan*, these "generalized" statements, *none* of which specifically concerned UBS's cross-border business or offered any type of affirmative guarantee regarding the basis for UBS's financial success, are immaterial puffery, upon which no "reasonable investor" would rely. (SPA35; 47-50.) In *JP Morgan*, this Court explained that such mere "generalizations regarding [a company's] business practices" are "puffery" by their very nature and "have consistently [been] held to be *inactionable*." 553 F.3d at 206.

In arguing that statements that would otherwise be puffery *become* actionable when a company "link[s] its financial success" to those statements (Plaintiffs' Br. at 35, 51-52), Plaintiffs ignore that this Court rejected that argument in *JP Morgan*. There, plaintiffs claimed that JP Morgan's aspirational statements about its "reputation for integrity" and "highly disciplined" risk management processes were *not* puffery, because JP Morgan "emphasiz[ed] to investors that integrity and risk management were crucial to its success." Reply Brief for Plaintiffs-Appellants, *JP Morgan*, 2007 WL 6449822, at *4; *see also id.* ("JPMC

had repeatedly emphasized … that JPMC's success depends ... equally on ... a reputation for business practices of the highest quality' to its investors.").

> But, in rejecting this argument, this Court explained:

> > Plaintiffs conflate the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation. While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity *per se* material.

553 F.3d at 206; *see also Boca Raton*, 2012 WL 6621391, at *1, *3-4 (statements praising McGraw-Hill's credit-ratings service's "honesty and integrity" held inactionable, despite allegations that ratings were a "sham," because of the statements' "generic, indefinite nature," and irrespective of their "scope"); *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 56-57, 59 (2d Cir. 1996) (statements that company "will not compromise its financial integrity" and "[is] convinced our business strategies will *lead to continued prosperity*" were puffery) (emphasis added).

> In any event, as Judge Sullivan held, the alleged aspirational misstatements, read as a whole, do not support Plaintiffs' theory: "there is no indication that UBS asserted that its financial success was attributable to its adherence to laws or to a particular advantage it had over its peer institutions." (SPA49.)

*JP Morgan* likewise bars Plaintiffs' claim that statements that are "puffery" can *become* actionable if the defendant had "knowledge" of the falsity of these statements. (*See* Plaintiffs' Br. at 34-36, 52.) There, the plaintiffs alleged that JP Morgan and two of its senior officers responsible for the bank's disclosures, including the Vice Chairman, knew of its "complicity in Enron's financial scandals" through JP Morgan's issuance of illicit loans to Enron. Notwithstanding these allegations of senior management knowledge, this Court held that the alleged misstatements still were "inactionable," because the statements were "broad, general statements ... [that] could not reasonably be relied upon as a guarantee." *JP Morgan*, 553 F.3d at 206. *See also Herman* v. *Legent Corp.*, 50 F.3d 6, 6 (4th Cir. 1995) ("Once a statement is determined to be commonplace commercial puffery, our inquiry ends. We do not need to consider the remaining Rule 10b-5 elements because such a statement is not material, and thus is not actionable as a matter of law."). In other words, puffery statements are inactionable because investors do not rely on them, regardless of whether the makers of such statements acted with scienter in making them.

Here, Plaintiffs conflate puffery, which is *per se* "inactionable" because it is not material and so not relied upon by investors, and specific statements of *opinion* based on existing facts, which this Court has held *may* be actionable if a plaintiff can plead and prove that "the statement was both

objectively false *and disbelieved by the defendant at the time it was expressed*."
*Fait*, 655 F.3d at 110 (emphasis added). Other courts, although not the authority
on which Plaintiffs rely,[34] have properly distinguished between the puffery and
opinion doctrines. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (Castel, J.) ("[T]here is a difference
between enthusiastic statements amounting to general puffery and opinion-based
statements that are anchored in misrepresentations of existing facts.").

Because the challenged UBS disclosures were puffery, not "opinion-
based statements anchored in misrepresentations of existing facts" *id.*, Judge

---

[34]    *Richman* v. *Goldman Sachs Group, Inc.* ("*Goldman*"), 868 F. Supp. 2d 261
(S.D.N.Y. 2012) (Crotty, J.), is the only post-*JP Morgan* decision cited by
Plaintiffs to hold that a defendant's subjective belief as to the truth of statements
that are otherwise puffery is relevant to an analysis of whether the statement is
actionable. But *Goldman* did not address *JP Morgan* and, thus, is not persuasive.
*See Zalaski* v. *City of Bridgeport Police Dep't*, 613 F.3d 336, 342 (2d Cir. 2010)
(per curiam) ("[W]e are ... troubled that the district court did not consider any of
the leading precedents on forum analysis.").

Plaintiffs' other cases are inapposite, as they involved factual guarantees as
opposed to the aspirational statements challenged here. *See Novak*, 216 F.3d at
304, 311, 315 (finding actionable affirmative guarantees "about the status of [the
company's] inventories" being "under control," "in good shape" and "at reasonable
or expected levels," which explicitly denied existing knowledge that the company
"had serious inventory problems" (quotations omitted)); (SPA50 (distinguishing
*Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) (Sweet,
J.), on the ground that defendants there "made positive assurance that, for instance,
they 'would continue to experience rapidly rising sales and profits on its core
products and new product offerings' and were 'positioned ... for dramatic
revenue,'" whereas, in this case, "none of the [alleged mis]statements reflect
affirmative statements or guarantees as to UBS's performance").)

Sullivan correctly applied *JP Morgan* to dismiss Plaintiffs' claims based on these plainly aspirational statements.

**B.    The District Court Properly Dismissed Plaintiffs' Claims Based on Alleged Misstatements Regarding the Remediation of "Gaps" in UBS's Tax Reporting Systems for Its U.S. Investment Bank.**

On appeal, Plaintiffs also claim that UBS misled the market "by touting UBS's 2004 efforts to cooperate with the IRS and remediate 'gaps in [UBS's] systems and processes which led to incomplete client tax documentation in some of [UBS's] US operations,' but, at the same time, concealing the Tax Scheme."  (Plaintiffs' Br. at 52.)  But, as the UBS Defendants argued to the District Court, the Complaint itself makes clear that the disclosures upon which Plaintiffs rely (*id.* (citing JA231-32 ¶ 460; 280-84 ¶¶ 572, 574, 578; 3493; 3512)) concerned "gaps" in withholding systems at the UBS's Investment Bank's U.S. operations during 2004, and had nothing to do with UBS's Wealth Management business, much less the small Swiss-based U.S. cross-border business within that global business.  As the District Court recognized, Plaintiffs "concede[d]" any arguments disputing that the disclosure was misleading "by not addressing the UBS Defendants' argument as to these alleged 'gaps' at all in [their] opposition brief."  (SPA36.)

In any event, the District Court then addressed the merits of Plaintiffs' position and correctly concluded that the "US operations" to which these

disclosures referred were that "of *the investment bank*," not the separate Wealth Management business.  (JA231 ¶ 460 (emphasis added); *see* SPA36.)  Therefore, Plaintiffs' argument that UBS breached a "duty to inform investors of all material facts" (Plaintiffs' Br. at 53) fails, because the allegedly omitted facts relating to the cross-border business have nothing to do with UBS's earlier statements about "gaps" at the U.S. Investment Bank during 2004.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (no duty to disclose information "merely because a reasonable investor would very much like to know [it]").

### C.    Plaintiffs May Not Rely on Appeal on Purported Misstatements Not Alleged in the Complaint.

On appeal, Plaintiffs also claim that UBS's annual reports from 2005 to 2007 contained misrepresentations in that they generally described the Wealth Management International business as providing services to "wealthy and affluent clients around the world (except domestic US clients)."  (Plaintiffs' Br. at 54.)  But, as Plaintiffs concede, this alleged misstatement, which simply concerned the general "[o]rganizational structure" (JA1419) of UBS's Wealth Management business, was not even "identified in the Complaint."  (Plaintiffs' Br. at 54 n.21;

*see also* JA3515:1-3 (counsel "confess[ing]" the alleged misstatement is "not in the complaint").)[35]

To overcome their failure of pleading, Plaintiffs claim they "would have included the statements in [yet another] amended complaint." (Plaintiffs' Br. at 54.) But Plaintiffs never made this representation to the District Court. And, in any event, the District Court acted within its discretion in denying Plaintiffs leave to file a fourth amended complaint. *See infra* pp. 90-93; *Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139-40 (2d Cir. 2011) (stressing that plaintiff "never indicated to the district court how further amendment would permit him to cure the deficiencies in the complaint" and "we have no occasion to address whether a hypothetical complaint" could state a claim).

In any event, Plaintiffs do not even attempt to explain how this description of UBS's "[o]rganizational structure" (JA1419), which simply indicated that international clients were serviced by one unit (Wealth Management International), and U.S. clients were serviced by another (Wealth Management US), would have been material to a reasonable investor.

---

[35] For this reason, with respect to their Exchange Act claims, Plaintiffs do not meet the Reform Act's express requirement that the "*complaint* ... specify each statement alleged to have been misleading[] [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *Kleinman* v. *Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013).

-85-

## D.    After Disclosing the DOJ and SEC Investigations, UBS Was Not Obligated To Accuse Itself of Wrongdoing.

The District Court also properly held that after disclosing the pending, but incomplete, DOJ and SEC investigations of its very small cross-border business, and the risks that UBS faced from those investigations, UBS had no duty to accuse itself of "uncharged, unadjudicated wrongdoings."   (SPA44 (quoting *Ciresi*, 782 F. Supp. at 823, *aff'd without opinion*, 956 F.2d at 1161).)[36]   In doing so, Judge Sullivan applied the settled law in this Circuit.  *See*, *e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 377 (S.D.N.Y. 2009) (Jones, J.) ("[F]irms have no duty to accuse themselves of unproven, allegedly illegal policies[.]"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."), *aff'd sub nom. Albert Fadem Trust* v. *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

Plaintiffs do not cite a single case—even one—where a court has held that a company violated the securities laws, because the company did not accuse itself or its employees of wrongdoing before the government did so.  Such a

---

[36]    Plaintiffs do not challenge this holding with respect to their Exchange Act claims on appeal and thus have waived this as a basis to appeal that holding.  *JP Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

disclosure rule would put public companies in the untenable position—contrary to the interests of their shareholders—of having to make binding admissions about uncharged employee misconduct before the government did so, making it difficult to resolve government investigations on the best possible terms. Indeed, if the securities laws required disclosure of uncharged misconduct, following every government enforcement action, whether against a company or its executives, there would be securities litigation over what a company knew and when about the underlying conduct.

Nor can Plaintiffs manufacture a duty to reveal "uncharged" misconduct by claiming that UBS's May 2008 disclosures of the DOJ and SEC investigations were "materially misleading for what they omitted." (Plaintiffs' Br. at 42-48.) Once UBS disclosed those investigations and the corresponding risks arising from them, UBS did not have to go further and engage in a "rite of confession," *I. Meyer Pincus*, 936 F.2d at 762, before these investigations were more finally resolved. (SPA44; Underwriters' Br. at 19-32.) "A corporation does not have a duty to disclose information simply because it is material ... or because it suggests that the corporation or its employees engaged in uncharged illegal conduct." (SPA44 (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) (Holwell, J.)).)

Thus, as courts in this Circuit have repeatedly held, the securities laws did not require UBS to speculate as to the possible impact of "uncharged, unadjudicated wrongdoings," *Ciresi*, 782 F. Supp. at 819, on UBS's financial condition, and the "simple fact that a criminal conviction would have an adverse impact upon [UBS's] operations in general or bottom line," *FBR*, 544 F. Supp. 2d at 357, does not trigger any disclosure obligation. The Complaint does not allege that UBS was in a position to disclose any non-speculative impact on its business arising from these pending investigations prior to their completion, including the impact of any fines or other not yet imposed sanctions. Obviously, until the investigations were resolved, UBS did not know what action the DOJ and SEC would take, and what the collateral consequences would be for UBS.

In *In re Pfizer Inc. Shareholder Derivative Litigation*, for example, the DOJ announced that Pfizer had agreed to pay $2.3 billion in fines and penalties—the "largest criminal fine ever imposed in the United States"—arising out of Pfizer's illegal, "off-label" marketing of various drugs for non-approved purposes. 722 F. Supp. 2d 453, 454, 457 (S.D.N.Y. 2010) (Rakoff, J.). Plaintiffs alleged that Pfizer's disclosures relating to the investigation were misleading because the company disclosed only that "the Government was investigating Pfizer's promotional practices for certain drugs," and did not disclose the full extent of employee misconduct relating to off-label marketing. *Id.* at 464. But

Judge Rakoff held that the disclosure of the investigation was not misleading on account of any such omission, because the company had no obligation to disclose "uncharged, unadjudicated" wrongdoing of employees. *Id. See also Goldman*, 868 F. Supp. 2d at 273-74 (no duty to disclose the receipt of a Wells Notice, even after previously providing "some notice about ongoing governmental investigations," because "defendants [a]re not bound to predict ... the 'imminent' or 'likely' outcome of ... investigations" (alterations in original)).

For these reasons, Judge Sullivan correctly held that "UBS had no further duty to disclose" beyond what was contained in its May 2008 disclosures. (SPA44.) And, even if UBS's disclosures about those investigations were somehow inadequate, Judge Sullivan correctly held that a "collection of news articles and reports" rendered any omissions immaterial, because they would not be viewed as "significantly altering the total mix of information available." (SPA44-47; Underwriters' Br. at 38-46.)

### E.    Regulation S-K Did Not Require Additional UBS Disclosures About Its Cross-Border Business in the Rights Offering.

As to the Securities Act claims, SEC Regulation S-K, Item 503(c)— which Plaintiffs relegated below to a footnote of their brief—is the only statute or regulation that Plaintiffs have ever cited as creating any disclosure obligations for UBS in relation to the Rights Offering. Item 503(c), in turn, requires only the disclosure of the "most significant factors that make the offering speculative or

risky." 17 C.F.R. § 229.503(c). Judge Sullivan correctly held that the uncharged illegal conduct of 45 to 60 employees in a small part of UBS's global business did not meet this standard. (SPA43.) (*See* Underwriters' Br. at 20-28.)

And, even assuming *arguendo* that this uncharged conduct did trigger a disclosure requirement under Item 503(c), the offering materials' disclosures of UBS's involvement in "multiple legal proceedings and government investigations," which could lead to "substantial monetary damages and legal costs ... [and] criminal ... penalties," satisfied Item 503(c)'s disclosure requirements. (SPA43.) (*See* Underwriters' Br. at 28-32.)[37]

\* \* \*

For these reasons, Judge Sullivan correctly dismissed Plaintiffs' claims under both the Exchange Act and the Securities Act relating to a "very small" part of UBS's global business.

## IV.  THE DISTRICT COURT PROPERLY REJECTED PLAINTIFFS' INFORMAL REQUEST FOR LEAVE TO AMEND.

In dismissing the Complaint "with prejudice," Judge Sullivan did not abuse his discretion in denying Plaintiffs' informal request for leave to amend

---

[37]  For the reasons stated in the Underwriters' Brief at 55-60, the District Court correctly dismissed the sole Securities Act Plaintiff's Section 12(a)(2) claim for lacking of standing, because it did not allege that it "purchased its shares from" UBS Securities LLC or that "[UBS Securities LLC] specifically and successfully solicited [plaintiff's] purchases." (SPA39.)

contained in their opposition brief below, which stated only that "[i]f any of Lead Plaintiff's claims are found deficient, Lead Plaintiff requests leave to replead." (JA3362.)

*First*, even though leave to replead generally is "freely give[n]," Fed. R. Civ. P. 15(a)(2), this Court has held that district courts have discretion to "implicitly" deny any such requests, where, as here, (i)  "leave is requested informally in a brief filed in opposition to a motion to dismiss," and (ii) in making the request, plaintiffs merely stated that "they 'would be able to redress perceived deficiencies' in their complaint."  *In re Tamoxifen Citrate Antitrust Litig.*, 446 F.3d 187, 220 (2d Cir. 2006).

Fatally, in the District Court, Plaintiffs did not "specify[] what additional facts, if any, they might assert in a new pleading."  *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011) (finding "no abuse of discretion in the district court's implicit denial of plaintiffs' cursory requests for leave to amend" made "[i]n their briefs in opposition to the [defendants'] motions to dismiss"); *accord Wilson*, 671 F.3d at 140 (affirming denial of leave to amend plaintiffs "assert[ed] in conclusory terms that '[g]reater detail can be provided'") (second  alteration in original).

*Second*, "a party cannot wait to 'see how he would fare on [a] prior motion to dismiss' before seeking leave to amend based on facts that were

available before the motion was decided. In circumstances such as this, it is thus 'certainly within [this Court's] discretion to deny leave to amend.'" *Compania Embotelladora Del Pacifico S.A.* v. *Pepsi Cola Co.*, 607 F. Supp. 2d 600, 603 (S.D.N.Y. 2009) (Rakoff, J.) (quoting *Vine* v. *Beneficial Fin. Co.*, 374 F.2d 627, 637 (2d Cir. 1967)); *Ruotolo* v. *City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (affirming denial of leave to amend where the plaintiff "did not move promptly" to amend in light of recent case law, and where the plaintiff "waited until after the district court dismissed his complaint to propose an amendment").

*Third*, Plaintiffs had multiple opportunities to remedy any "perceived defects" in their 1,447-paragraph Complaint. The operative Complaint is the fourth complaint filed in this action over more than five years. *See Wilson*, 671 F.3d at 139 (amendment upon consolidation is an "amendment" under Fed. R. Civ. P. 15); *accord Bellikoff* v. *Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007).

Prior to Plaintiffs' filing the instant Complaint in May 2009—when Judge Sullivan expressly told Plaintiffs that it was "[his] expectation ... that this is going to be the last amended complaint" (JA1142)—Defendants had filed three extensive memoranda of law detailing the deficiencies in Plaintiffs' legal theories. After the filing of the Complaint, Defendants and *amici* further detailed the legal defects in the Complaint in seven separate lengthy memoranda of law. After

receiving those briefs, Plaintiffs never sought to amend their already amended Complaint.

Consequently, the claim that Plaintiffs were not "afforded the opportunity to address any perceived defects to the Complaint" (Plaintiffs' Br. at 89) is contrary to the record below. *See Wilson*, 671 F.3d at 139 (plaintiffs "on notice" of defects in a complaint based on a "prior ... motion to dismiss"). And, this Court has squarely rejected the notion that the *District Court* must identify any "perceived defects" on Plaintiffs' behalf, providing them "an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies." *Bellikoff*, 481 F.3d at 118.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed in its entirety.

<div style="margin-left:40%">

Respectfully,

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
Matthew A. Schwartz
Justin J. DeCamp
Thomas C. White

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for the UBS Defendants-Appellees*

</div>

May 10, 2013

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's April 22, 2013 order granting the UBS Defendants-Appellees permission to file an oversized joint brief (ECF No. 110), because this brief contains 20,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Counsel for the UBS Defendants-Appellees*

May 10, 2013