12-4355-cv

*City of Pontiac v. UBS AG et al.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2013

No. 12-4355-cv

CITY OF PONTIAC POLICEMEN'S AND FIREMEN'S RETIREMENT SYSTEM,
ARBEJDSMARKEDETS TILLAEGSPENSION, UNION ASSET MANAGEMENT
HOLDING AG, COUNSEL OF THE BOROUGH OF SOUTH TYNESIDE,
*Plaintiffs-Appellants,*

OREGON PUBLIC EMPLOYEES BOARD, AND ALASKA LABORERS–
EMPLOYERS RETIREMENT FUND,
*Movants-Appellants,*

*v.*

UBS AG, PETER A. WUFFLI, CLIVE STANDISH, DAVID S. MARTIN,
MARCEL OSPEL, MARCEL ROHNER, MARCO SUTER, WALTER
STUERZINGER, RAMESH SINGH, HUW JENKINS, JAMES STEHLI, JOHN
COSTAS, MICHAEL HUTCHINS, DEUTSCHE BANK AG, BNP PARIBAS,
CREDIT SUISSE, J.P. MORGAN SECURITIES LTD., MORGAN STANLEY &
CO. INTERNATIONAL PLC, GOLDMAN SACHS INTERNATIONAL,
DEUTSCHE BANK AG, LONDON BRANCH, UBS SECURITIES LLC,
ERNESTO BERTARELLI, STEPHAN HAERINGER, GABRIELLE KAUFFMAN-
KOHLER, SERGIO MARCHIONNE, ROLF A. MEYER, PETER VOSER,
LAWRENCE A. WEINBACH, JOERG WOLLE, HELMUT PANKE, PETER
SPUHLER,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 07 CV 11225 (RJS) — Richard J. Sullivan, *Judge*.

————

ARGUED: DECEMBER 12, 2013
DECIDED: MAY 6, 2014

————

Before: CABRANES, HALL and CHIN, *Circuit Judges*.

————

In this appeal we consider, as a matter of first impression, whether the bar on extraterritorial application of the United States securities laws, as set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), precludes claims arising out of foreign-issued securities purchased on foreign exchanges, but cross-listed on a domestic exchange (the so-called "listing theory"). We also consider whether the alleged misstatements at issue here are actionable under the securities laws.

We conclude that: (1) the Supreme Court's decision in *Morrison* precludes claims brought pursuant to the Securities Exchange Act of 1934 ("Exchange Act") by purchasers of shares of a foreign issuer on a foreign exchange, even if those shares were cross-listed on a United States exchange; (2) claims brought under the Securities Act of 1933 ("Securities Act") based on disclosures made in connection with a UBS June 13, 2008 registered rights offering were properly dismissed because they are immaterial and/or inactionable "puffery," as that term is defined in our case law; and

(3) Exchange Act claims arising out of defendants' statements regarding positions in, and valuation of, mortgage-related assets were properly dismissed for failure to adequately plead a material misrepresentation or scienter.

Accordingly, we **AFFIRM** the September 13, 2011 and September 28, 2012 judgments of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*).

_____

GREGORY M. CASTALDO (Andrew L. Zivitz, Sharan Nirmul, Richard A. Russo, Jr., Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Jennifer L. Joost, Kessler Topaz Meltzer & Check, LLP, San Francisco, CA; Geoffrey C. Jarvis, Grant & Eisenhofer P.A., Wilmington, DE; Jay W. Eisenhofer, Charles T. Caliendo, Brenda F. Szydlo, Grant & Eisenhofer P.A., New York, NY; Samuel H. Rudman, Robert M. Rothman, Robbins Geller Rudman & Dowd LLP, Melville, NY; Gregg S. Levin, Motley Rice LLC, Mt. Pleasant, SC; William H. Narwold, Motley Rice LLC, Hartford, CT, *on the brief*) Kessler Topaz Meltzer & Check, LLP, Radnor, PA, *for Plaintiffs-Appellants*

ROBERT J. GIUFFRA, JR. (Matthew A. Schwartz, Justin J. DeCamp, Thomas C. White, *on*

*the brief*) Sullivan & Cromwell LLP, New York, NY, *for UBS Defendants-Appellees*

BARRY R. OSTRAGER (Jonathan K. Youngwood, Craig S. Waldman, *on the brief*) Simpson Thacher & Bartlett LLP, New York, NY, *for Underwriter Defendants-Appellees.*

————————

JOSÉ A. CABRANES, *Circuit Judge*:

In this appeal we consider, as a matter of first impression, whether the bar on extraterritorial application of the United States securities laws, as set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), precludes claims arising out of foreign-issued securities purchased on foreign exchanges, but cross-listed on a domestic exchange (the so-called "listing theory"). We also consider whether the alleged misstatements at issue here are actionable under the securities laws.

We conclude that: (1) the Supreme Court's decision in *Morrison* precludes claims brought pursuant to the Securities Exchange Act of 1934 ("Exchange Act") by purchasers of shares of a foreign issuer on a foreign exchange, even if those shares were cross-listed on a United States exchange; (2) claims brought under the Securities Act of 1933 ("Securities Act") based on disclosures made in connection with a UBS June 13, 2008 registered rights offering were properly dismissed because they are immaterial and/or inactionable "puffery," as that term is defined in our case law; and

(3) Exchange Act claims arising out of defendants' statements regarding positions in, and valuation of, mortgage-related assets were properly dismissed for failure to adequately plead a material misrepresentation or scienter.

Accordingly, we affirm the September 13, 2011 and September 28, 2012 judgments of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) dismissing all claims with prejudice.

## BACKGROUND

Plaintiffs, a group of foreign and domestic institutional investors,[1] bring this putative class action against UBS AG ("UBS") and a number of UBS officers and directors (together with UBS, "UBS Defendants"),[2] alleging violations of §§ 10(b) and 20(a) of the

---

[1] Foreign plaintiffs are Arbejdsmarkedets Tillaegspension ("ATP"), Union Asset Management Holding AG ("Union") and International Fund Management, S.A. ("IFM"). Other named plaintiffs are City of Pontiac Policemen's and Firemen's Retirement System ("Pontiac"), Council of the Borough of South Tyneside ("Tyneside"), William L. Wesner, Teamsters Union Local 500 Severance Fund ("Teamsters"), Oregon Public Employees Board ("OPEB"), and Alaska Laborers–Employers Retirement Fund ("Alaska Laborers").

[2] The "UBS Defendants" are UBS AG; former UBS officers and executives, including Peter A. Wuffli, Clive Standish, David S. Martin, Marcel Ospel, Marcel Rohner, Marco Suter, Walter Stuerzinger, Ramesh Singh, Huw Jenkins, James Stehli, John Costas, and Michael Hutchins; and current and former members of the UBS board of directors, including Ernesto Bertarelli, Stephan Haeringer, Gabrielle Kaufman-Kohler, Sergio Marchionne, Rolf A. Meyer, Peter Voser, Lawrence A. Weinbach, Joerg Wolle, Helmut Panke, and Peter Spuhler.

Exchange Act[3] in connection with the purchase of UBS "ordinary shares" between August 13, 2003 and February 23, 2009 (the "Class Period"). These shares were listed on foreign exchanges and the New York Stock Exchange ("NYSE"). Plaintiffs allege that the UBS Defendants violated the Exchange Act by making, in conjunction with issuance of the ordinary shares, fraudulent statements regarding: (1) UBS's mortgage-related assets portfolio (the "CDO/RMBS Fraud"); and (2) UBS's purported compliance with United States tax and securities laws by UBS's Swiss-based global cross-border private banking business (the "Tax Fraud").[4]

Plaintiff Alaska Laborers–Employers Retirement Fund ("Alaska Laborers") also brings this action on behalf of a class that purchased ordinary shares of UBS in connection with the Company's June 13, 2008 Rights Offering (the "Offering"), alleging that the UBS Defendants and a group of Underwriters[5] violated §§ 11, 12(a)(2), and 15 of the Securities Act[6] by making misleading statements regarding the alleged Tax Fraud in connection with the Offering.

---

[3] 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

[4] Plaintiffs also alleged fraud arising out of statements by UBS regarding its Auction Rate Securities portfolio, but do not press this claim on appeal.

[5] The Underwriters are Deutsche Bank AG, BNP Paribas, Credit Suisse, J.P. Morgan Securities Ltd., Morgan Stanley & Co. International Plc, Goldman Sachs International, Deutsche Bank AG, London Branch, and UBS Securities LLC.

[6] 15 U.S.C. §§ 77k, 77l(a)(2), 77o.

### A.      The CDO/RMBS Fraud

Plaintiffs allege that UBS accumulated and overvalued $100 billion in residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs" and, together with RMBS, "mortgage-related assets")[7] between February 13, 2006 and April 21, 2008, without disclosing this to shareholders and in contravention of its representations regarding its risk management policies.

The acquisition of the $100 billion portfolio began with the 2006 launch of Dillon Read Capital Management ("DRCM"), an internal hedge fund[8] run by John Costas, the CEO of UBS's Investment Bank ("IB"). According to plaintiffs, DRCM began

---

[7] We have explained that RMBS are "a type of asset-backed security—that is, a security whose value is derived from a specified pool of underlying assets. Typically, an entity (such as a bank) will buy up a large number of mortgages from other banks, assemble those mortgages into pools, securitize the pools (i.e., split them into shares that can be sold off), and then sell them, usually as bonds, to banks or other investors." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710 n.3 (2d Cir. 2011) (internal quotation marks omitted). The RMBS at issue here are collateralized by pools of subprime, or high risk, mortgage loans. The CDOs in question are bonds secured by a pool of RMBS which, in turn, are collateralized by subprime loans.

[8] An internal hedge fund is a discrete business unit within a financial institution that is devoted entirely to "proprietary trading"—that is, trading with the firm's own money instead of depositors' money, which enables the bank to make a higher profit. *Examining the Impact of the Volcker Rule on Markets, Businesses, Investors, and Job Creation: J. Hearing Before the Subcomm. on Fin. Insts. and Consumer Credit and the Subcomm. on Capital Mkts. and Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 112 Cong. 214-15 (2012) (statement of Daniel K. Tarullo, Governor, Board of Governors of the Federal Reserve System).

acquiring billions of dollars' worth of RMBS/CDOs, which added "pressure to grow IB Fixed Income." Accordingly, the IB began acquiring the same types of assets on a larger scale. Following significant write-downs on DRCM's subprime portfolio, UBS closed DRCM and reintegrated its $20 billion portfolio into the IB.

Plaintiffs allege that UBS concealed the scope of the IB's subprime portfolio (disclosing $23 billion rather than $100 billion) and, as the subprime market began to collapse in February 2007, concealed the losses in that portfolio by failing to revalue the mortgage-related assets. Plaintiffs allege that UBS belatedly announced its first mortgage-related write-down of $4 billion on October 1, 2007, and ultimately wrote down the portfolio by $48 billion.

### B.    The Tax Fraud

Plaintiffs also allege that UBS made materially misleading statements regarding an alleged scheme in which UBS Swiss bankers traveled in and out of the United States to illegally advise American clients on the purchase of investments.[9] Specifically, in May 2008, following the indictment of certain UBS employees in connection

---

[9] UBS's Global Wealth Management & Business Banking contained a division called "Wealth Management International & Switzerland" ("WMI"), which catered mostly to affluent individuals overseas. Within WMI was UBS's Swiss-based cross-border private banking business. Through this banking business, UBS allegedly breached the terms of a 2001 Qualified Intermediary Agreement with the IRS, requiring UBS to disclose the identity of and/or withhold income taxes for American clients who traded in United States securities or had United States-sourced income.

with the tax scheme, UBS made two disclosures, which revealed that the United States Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") were investigating UBS's conduct with regard to the cross-border services it provided to American clients between 2001 and 2007.[10]

On February 19, 2009, UBS entered into a Deferred Prosecution Agreement[11] with the DOJ and the Internal Revenue Service ("IRS"), which revealed that UBS had violated United States tax laws, and disclosed that UBS had paid a $780 million fine and admitted participation in a conspiracy to defraud the IRS.

### C. Procedural History

On September 13, 2011, the District Court dismissed the claims of foreign and domestic plaintiffs who purchased the UBS shares on foreign exchanges.[12] On September 28, 2012, the District Court dismissed all remaining claims against the UBS Defendants under the Exchange Act for failure to adequately plead the elements

---

[10] *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *5 (S.D.N.Y. Sept. 28, 2012) ("2012 Op.").

[11] According to the SEC, "[d]eferred prosecution agreements (DPAs) encourage . . . companies to provide the SEC with forthcoming information about misconduct and assist with a subsequent investigation.  In return, the SEC refrains from prosecuting cooperators for their own violations if they comply with certain undertakings." November 12, 2013 SEC Press Release, *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370540345373#.UxY_TONdVBk.

[12] *See In re UBS Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2011 WL 4059356, at *1 (S.D.N.Y. Sept. 13, 2011) ("2011 Op.").

of fraud, and dismissed Alaska Laborers' claims under the Securities Act for failure to adequately allege a material misstatement and for lack of statutory standing under § 12(a)(2) of the Securities Act.[13]

This timely appeal followed.

## DISCUSSION

We review *de novo* a district court judgment granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true.[14] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[15] In making this determination, we may consider "any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."[16]

---

[13] *See generally* 2012 Op.

[14] *Absolute Activist Value Master Fund Ltd. v. Ficeto* ("*Absolute Activist*"), 677 F.3d 60, 65 (2d Cir. 2012).

[15] *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (internal quotation marks omitted).

[16] *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted).

**A. Viability Under *Morrison v. National Australia Bank* of Claims Based on Foreign Shares Purchased on a Foreign Exchange**

Three foreign institutional investors—plaintiffs Union, IFM, and ATP—and one domestic investor—plaintiff OPEB—purchased their UBS (foreign-issued) ordinary shares on a foreign exchange. The District Court, relying on the Supreme Court's decision in *Morrison v. National Australia Bank*, dismissed these claims. We address the claims of the foreign and domestic plaintiffs separately.

**1.    "Foreign Cubed" Claims[17]**

*Morrison* answered in the negative the question "whether [§ 10(b)] provides a cause of action to foreign plaintiffs suing foreign [ ] defendants for misconduct in connection with securities traded on foreign exchanges."[18] It held instead that § 10(b) only provided a private cause of action arising out of "[1] transactions in securities listed on domestic exchanges, and [2] domestic transactions in other securities."[19]

Plaintiffs argue that, by its express terms, the *Morrison* bar is limited to claims arising out of securities "*[not] listed* on a domestic

---

[17] A so-called "foreign-cubed" action involves claims in which "(1) foreign plaintiffs [are] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries." *Morrison,* 561 U.S. at 283 n.11 (Stevens, J., *concurring*) (emphasis omitted).

[18] *Id.* at 250-51.

[19] *Id.* at 267.

exchange."[20] Under plaintiffs' so-called "listing theory,"[21] the fact that the relevant shares were cross-listed on the NYSE brings them within the purview of Rule 10(b), under the first prong of *Morrison*—"transactions in securities listed on domestic exchanges." We conclude that, while this language, which appears in *Morrison* and its progeny, taken in isolation, supports plaintiffs' view, the "listing theory" is irreconcilable with *Morrison* read as a whole.

*Morrison* emphasized that "the focus of the Exchange Act is . . . upon *purchases and sales* of securities in the United States."[22] As the District Court recognized, this evinces a concern with "the location of the securities *transaction* and not the location of an exchange where the security may be dually listed."[23] *Morrison's* emphasis on "*transactions* in securities listed on domestic exchanges,"[24] makes clear that the focus of both prongs was domestic transactions of any kind, with the domestic listing acting as a proxy for a domestic transaction. Indeed, the Supreme Court

---

[20] *Id.* at 273 (emphasis supplied).

[21] To our knowledge, no Circuit has yet addressed the viability of the so-called "listing theory"—whether listing on a domestic exchange, absent a transaction on that exchange, provides a private cause of action under §10(b).

[22] 561 U.S. at 266 (emphasis supplied).

[23] 2011 Op. at *5 (emphasis in original). *Cf. Absolute Activist*, 677 F.3d at 68-69 ("The second prong of [the *Morrison*] test refers to 'domestic transactions in other securities,' not 'transactions in domestic securities' or 'transactions in securities that are registered with the SEC.'" (citation omitted)).

[24] 561 U.S. at 267 (emphasis supplied).

explicitly rejected the notion that the "*national* public interest pertains to transactions conducted upon *foreign* exchanges and markets."[25] Furthermore, in *Morrison*, although the Ordinary Shares at issue were not traded on any domestic exchange, the Court noted that "[t]here are listed on the [NYSE], however, [defendant]'s American Depositary Receipts (ADRs), which represent the right to receive a specified number of [its] Ordinary Shares."[26] This did not affect the Court's analysis of the shares that were purchased on foreign exchanges.

Perhaps most tellingly, in rejecting this Circuit's "conduct and effects" test in favor of a bright-line rule, *Morrison* rejected our prior holding that "'the Exchange Act [applies] to transactions regarding

---

[25] *Id.* at 263 (emphasis in original); *see also id.* at 267("[N]o one [ ] thought that the [Exchange] Act was intended to regulate *foreign* securities exchanges—or indeed [ ] even believed that . . . Congress had the power to do so." (emphasis in original, internal quotation marks and alterations omitted)). Moreover, insofar as the government has an interest in regulating shares listed on domestic exchanges, a plaintiff who did not purchase the shares on a domestic exchange would not obviously have standing to pursue this interest. *Cf. id.* at 285-86 (Stevens, J., *concurring*) ("[I]f petitioners' allegations of fraudulent misconduct that took place in Florida are true, then respondents may have violated § 10(b), and could potentially be held accountable in an enforcement proceeding brought by the [SEC]. But it does not follow that shareholders who have failed to allege that the bulk or the heart of the fraud occurred in the United States, or that the fraud had an adverse impact on American investors or markets, may maintain a private action to recover damages they suffered abroad.").

[26] *Id.* at 250.

stocks traded in the United States which are effected outside the United States . . . .'"[27]

In sum, *Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange. Accordingly, we affirm the judgment of the District Court insofar as it dismissed the claims of Union, IFM, and ATP.

## 2.    "Foreign Squared" Claims

Plaintiff OPEB is a U.S. entity that purchased some of its UBS shares on a foreign exchange by placing a so-called "buy order" in the United States, which was later executed on a Swiss exchange. In addition to advocating the "listing theory," OPEB argues that its purchase satisfies the second prong of *Morrison* because it constitutes a "purchase . . . of [a] security in the United States."[28]

In our decision in *Absolute Activist Value Master Fund Ltd. v. Ficeto* ("*Absolute Activist*") we explained that "'[a] securities

---

[27] *Id.*at 256 (quoting *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206 (2d Cir. 1968)); *id.* at 257 (noting that "with *Schoenbaum* . . . on the books, the Second Circuit had excised the presumption against extraterritoriality from the jurisprudence of § 10(b)"). *Schoenbaum* involved a similar, albeit distinguishable, fact pattern to the one at issue here—"the sale in Canada of the treasury shares of a Canadian corporation whose publicly traded shares (but not, of course, its treasury shares) were listed on both the American Stock Exchange and the Toronto Stock Exchange." *Id.* at 256.

[28] *Id.* at 273.

transaction is domestic [for purposes of *Morrison's* second prong] when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.'"[29] We must now decide—as an issue of first impression—whether the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange is sufficient to allege that a purchaser incurred irrevocable liability in the United States, such that the U.S. securities laws govern the purchase of those securities. We conclude that it is not.

Plaintiffs argue that "[w]hen a purchaser is a U.S. entity, 'irrevocable liability' is not incurred when the security is purchased on a foreign exchange[; rather it is incurred] in the U.S. where the buy order is placed."[30] As an initial matter, we have made clear that "a purchaser's citizenship or residency does not affect where a transaction occurs."[31] Accordingly, the fact that OPEB was a U.S. entity, does not affect whether the transaction was foreign or

---

[29] *United States v. Vilar*, 729 F.3d 62, 76 (2d Cir. 2013) (quoting *Absolute Activist*, 677 F.3d at 69).  The parties did not have the benefit of our holding in *Absolute Activist* when arguing before the District Court. However, OPEB relies on *Absolute Activist* in its briefs on appeal, and does not raise different or additional facts that would have established that the transactions in question were domestic. Accordingly, we can resolve the issue on appeal without granting leave to amend or remanding.  *See* Discussion Part D *post*.

[30] Appellant's Br. 88.

[31] *Absolute Activist*, 677 F.3d at 69 (internal quotation marks and alteration omitted).

domestic.[32] Nor does the allegation that OPEB placed a buy order in the United States that was then executed on a foreign exchange, standing alone, establish that OPEB incurred irrevocable liability in the United States.[33]

Accordingly, we affirm the judgment of the District Court dismissing the claims of OPEB, a domestic purchaser, insofar as its claims were based on purchases of foreign shares on foreign exchanges.[34]

---

[32] *See id.* ("a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States") (internal quotation marks omitted).

[33] Although we have held, in the context of "transactions [not] on a foreign exchange," that "facts concerning the formation of the contracts, *the placement of purchase orders*, the passing of title, or the exchange of money" may be relevant to determining whether irrevocable liability was incurred in the United States, *id.* at 69-70 (emphasis added), we have never held that the placement of a purchase order, without more, is sufficient to incur irrevocable liability, particularly in the context of transactions in foreign securities on a foreign exchange. *Cf. id.* at 62, 71 (holding that allegations that securities purchases were "brokered through a U.S. broker-dealer," standing alone, are insufficient to establish that irrevocable liability was incurred in the United States).

[34] We note that this conclusion is consistent with *Morrison*, in which the Supreme Court emphasized that, "the [Exchange] Act was [not] intended to regulate *foreign* securities exchanges." 561 U.S. at 267 (internal quotation marks and alterations omitted). As to this point, the concurrences in *Morrison* are arguably useful for discerning what the majority opinion *did not* hold. Justice Breyer concurred in the opinion only insofar as "the purchased securities are listed only on a few foreign exchanges, *none of which has registered with the [SEC]. . . [and] the relevant purchases of these unregistered securities took place entirely in Australia and involved only Australian investors*." *Id.* at 273 (Breyer, J., concurring) (emphasis supplied). And Justice Stevens contrasted "the Court's belief that transactions on domestic exchanges are 'the focus of the Exchange Act,'" with his view that "[i]n reality . . . it is the 'public interest' and 'the interests of investors' that are the

## B.  Securities Act Claims

Alaska Laborers alleges that the offering materials[35] distributed in connection with the June 13, 2008 Offering were materially false inasmuch as they stated that UBS held its employees to the highest ethical standards and complied with all applicable laws, and that UBS's wealth management division did not provide services to clients in the United States when, in fact, UBS was engaged in the cross-border tax scheme.[36] Plaintiffs allege further that the offering materials were materially incomplete inasmuch as they disclosed the DOJ investigation but concealed that the cross-border activities under investigation were ongoing, and concealed the magnitude of UBS's exposure to liability and reputational damage.

The District Court dismissed Alaska Laborers' claims under §§ 11 and 12(a)(2) of the Securities Act for, among other reasons, failure to allege material misrepresentations.[37] Section 11 establishes liability on the part of issuers of registration statements if

---

objects of the statute's solicitude." *Id.* at 284 (Stevens, J., *concurring*). The majority adopted no such caveats, nor recognized any such interests.

[35] The Offering Materials consisted of forms and reports filed with the SEC between March and May 2008.

[36] *See* Background Part B, *ante*.

[37] The District Court also found lack of statutory standing under § 12(a)(2). 2012 Op. at *25–27. Because we affirm on the basis of failure to plead a material misstatement or omission, we do not reach the standing issue.

any part of the registration statement, when such part
became effective, contained an untrue statement of a
material fact or omitted to state a material fact required
to be stated therein or necessary to make the statements
therein not misleading.[38]

Plaintiffs need not allege scienter, reliance, or causation.[39] The
standard is the same for claims pursuant to § 12(a)(2), which covers
prospectuses and oral communications.[40]

In assessing § 11 claims, we "conduct a preliminary inquiry
into whether plaintiffs' allegations are premised on fraud," or
merely on negligence, to determine the appropriate pleading
standard.[41] Where, as here, the claims sound in fraud—indeed, they
are identical to plaintiffs' tax fraud claims under § 10(b)—the
heightened pleading standard of Federal Rule of Civil Procedure

---

[38] 15 U.S.C. § 77k(a); *see also In re Morgan Stanley Info. Fund Sec. Litig.* ("*In re Morgan Stanley*"), 592 F.3d 347, 358 (2d Cir. 2010). Any of the following may form the basis for a claim under § 11 or § 12(a)(2) of the Securities Act: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin*, 634 F.3d at 715-16.

[39] *In re Morgan Stanley*, 592 F.3d at 359 (internal quotation marks omitted).

[40] *Compare* 15 U.S.C. § 77k(a) (registration statements), *with* § 77l(a)(2) (prospectuses and oral communications); *see also In re Morgan Stanley*, 592 F.3d at 359.

[41] *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 174 (2d Cir. 2011).

9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity.[42]

*First*, plaintiffs allege that UBS's involvement in the Tax Fraud rendered UBS's statements in the offering materials about compliance, reputation, and integrity materially misleading. It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable "puffery," meaning that they are "too general to cause a reasonable investor to rely upon them."[43] This is particularly true where, as here, the statements are explicitly aspirational, with qualifiers such as "aims to," "wants to," and "should." Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment.[44]

---

[42] *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011). *See also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud.").

[43] *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also id.* (noting that "the importance of a bank's reputation for integrity" does not render "a bank's statements regarding its reputation" material).

[44] *See id.* ("No investor would take such statements [about integrity and risk management] seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."). Plaintiffs also allege that UBS's statement that WMI did not provide services to clients in the United States was materially misleading because, in fact, UBS continued to be engaged in the Tax Fraud—a claim first raised at oral argument in the District Court. As an initial matter, plaintiffs

*Second*, plaintiffs argue that defendants' failure to disclose the tax scheme violated Regulation S-K, Item 503(c), which requires registrants to include in offering materials "a discussion of the most significant factors that make the offering speculative or risky,"[45] and rendered materially incomplete those disclosures UBS made concerning the DOJ investigation.

The offering materials disclosed that the DOJ was investigating whether, from 2000-2007, UBS client advisors entered the United States to help U.S. clients evade their tax obligations, in violation of U.S. law. Plaintiffs argue, in effect, that, in addition to disclosing the existence of an investigation, defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme.

---

waived this claim by not including it in the Complaint. Although plaintiffs argue that "[t]here is no requirement under the Securities Act that a complaint specifically identify each misrepresentation in the Offering Materials," Reply Br. 4, in fact that is exactly what Rule 9(b) requires along with an explanation of "why the statements were fraudulent." *Rombach*, 355 F.3d at 172 (internal quotation marks omitted). Moreover, plaintiffs failed to propose, below or on appeal, an amendment to the pleadings that would result in a viable claim. Accordingly, we need not give leave to amend based on some theoretically viable claim. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (In reviewing a district court's denial of leave to amend on grounds of futility "we consider the proposed amendments along with the remainder of the complaint" to determine whether the allegations, as amended, plausibly give rise to an entitlement of relief.) (internal quotation marks, citations and alterations omitted). *See also* Part D, *post.*

[45] 17 C.F.R. § 229.503(c).

As we have explained, "[d]isclosure is not a rite of confession,"[46] and companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing."[47] By disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS "to substantial monetary damages and legal defense costs," as well as "injunctive relief, criminal and civil penalties[,] and the potential for regulatory restrictions," UBS complied with its disclosure obligations under our case law.

In sum, plaintiffs have not pleaded any misstatements in the Offering that give rise to a cause of action under the Securities Act. Accordingly, we affirm the judgment of the District Court dismissing the claims of Alaska Laborers under §§ 11 and 12(a)(2) of the Securities Act.

### C.    Claims Under Section 10(b) of the Exchange Act

The District Court dismissed plaintiffs' § 10(b) claims for failure to plead materiality or scienter with respect to the CDO/RMBS Fraud, and failure to plead materiality as to the Tax Fraud.

A complaint alleging securities fraud under § 10(b) of the Exchange Act must satisfy the heightened pleading requirements of

---

[46] *In re Morgan Stanley*, 592 F.3d at 365 (internal quotation marks omitted).

[47] *Ciresi v. Citicop*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992).

Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[48] These well-known standards require, in relevant part, that "securities fraud complaints specify each misleading statement . . . [and] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[49]

Scienter may be established by facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[50] We have defined recklessness as a state of mind "approximating actual intent," which can be established by "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[51] The

---

[48] *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA is codified at 15 U.S.C. § 78u–4(b).

[49] *Anschutz*, 690 F.3d at 108 (internal quotation marks omitted).

[50] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs do not seriously press the argument that defendants had motive and opportunity to commit fraud on appeal. To the extent that they do argue motive and opportunity, we reject that theory of scienter for substantially the reasons stated by the District Court.

[51] *Novak v. Kasaks*, 216 F.3d 300, 308, 312 (2d Cir. 2000) (internal quotation marks and alterations omitted).

requisite "strong inference" of scienter is one which is "*at least as likely as* any plausible opposing inference."[52]

### 1.   CDO/RMBS Fraud Claims

Plaintiffs plead two categories of misstatements comprising the alleged CDO/RMBS fraud: (1) statements that UBS avoided "asset concentrations" as a "key pillar" of its risk management strategy; and (2) statements regarding UBS's valuation of its mortgage-related assets. We address each in turn.[53]

### a.   Avoidance of undue concentrations of risk

Plaintiffs allege that the UBS Defendants represented that "UBS, *inter alia*: (1) avoided 'concentrated positions' of assets; (2) implemented asset portfolio limits, and (3) engaged in limited 'proprietary' investing . . . ." at a time when they "knew of and had

---

[52] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (emphasis in original).

[53] In evaluating the alleged CDO/RMBS fraud, the District Court dismissed individual defendants Walter Stuerzinger, James Stehli, and Michael Hutchins on the grounds that under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011), "the individual defendants . . . must have actually 'made' the statements . . . to be held liable under Section 10(b)." 2012 Op. at *9-10. Appellants only appeal this conclusion as to Stuerzinger, whom they contend made an actionable misstatement: "We rigorously want to avoid risk concentrations of all kinds. We are basically obsessed with risk diversification." Appellants' Br. 55. The District Court held that plaintiffs had waived this argument by failing to address the argument in its opposition brief. 2012 Op. at *11. Even if it were not waived, we affirm the District Court's decision as to Stuerzinger because such general statements about risk management are not actionable. *See JP Morgan Chase*, 553 F.3d at 206 (holding that the "statement that [defendant] 'set the standard for best practices in risk management techniques'" was not actionable).

access to information concerning the $100 billion RMBS/CDO portfolio" and knew "that UBS had no portfolio limits." Plaintiffs aver that these facts support the inference that defendants "knew, or recklessly disregarded, that their representations to investors were materially false and misleading."[54] We disagree.

As a preliminary matter, plaintiffs do not plausibly allege that UBS's representations regarding asset concentrations were materially misleading. Plaintiffs contend that these statements are material "[b]ecause [UBS] represented that the avoidance of asset concentrations was vital to [its] business and success." But while importance is undoubtedly a *necessary* element of materiality,[55] importance and materiality are not synonymous.[56] To be "material" within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim.[57]

---

[54] Appellants' Br. 64.

[55] *See Litwin*, 634 F.3d at 717 (immaterial statements are those that are "so obviously unimportant . . . that reasonable minds could not differ") (internal quotation marks omitted).

[56] *See JPMorgan*, 553 F.3d at 206 ("While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material.").

[57] *See, e.g., id.* (statement that defendant "set the standard for best practices in risk management techniques . . . is so general that a reasonable investor would not depend on

UBS's representations that it prioritized "*adequate* diversification of risk" and "avoidance of *undue* concentrations," are too open-ended and subjective to constitute a guarantee that UBS would not accumulate a $100 billion RMBS portfolio, comprising 5% of UBS's overall portfolio, or 16% of its trading portfolio.[58] Plaintiffs do not allege that UBS represented that it had *specific* risk limits[59] on its acquisition of mortgage-related securities, that the $100 billion portfolio contravened.[60]

---

it as a guarantee that [defendant] would never take a step that might adversely affect its reputation"); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (holding that general statements regarding financial integrity lack materiality and are not reasonably relied upon as a guarantee that the company's actions would in no way impact its finances).

[58] Plaintiffs argue that comparison to the overall portfolio was improper and that the relevant comparison is to UBS's trading portfolio. The distinction is irrelevant to our holding, which is not that the $100 billion portfolio is itself immaterial, *i.e.* unimportant to an investor, because it constitutes only 5% of UBS's overall portfolio. Rather, we hold that the statements plaintiffs cite regarding risk strategies were too general to act as a guarantee that UBS would not amass such a portfolio. Nor do we foreclose the possibility that such statements could form the basis for a fraud claim, if, for example, plaintiffs alleged that defendants made such statements, but in fact engaged in no risk diversification at all or had an entirely different *undisclosed* policy. These are not the allegations before us.

[59] *Cf. In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 284 (S.D.N.Y. 2011) (finding actionable allegations that defendant was overruling and disregarding *specific* risk limits—specifically "balance sheet, concentration, and single transaction limits").

[60] *See* Joint App'x 100 ("Group treasury warned . . . that the IB *should* place a hard limit on the accumulation of the illiquid assets.") (emphasis supplied); *id* at 97 (UBS employees "understood how UBS could make aggressive bets *while operating within the risk controls* being enforced by Zurich") (emphasis supplied).

Moreover, UBS did disclose that it was "seeking to expand [its] fixed income business further by pursuing opportunities in . . . asset-backed securities," and disclosed, for example, increases in the portfolio of as much as 69 billion Swiss francs ("CHF")[61] in 2006. As the District Court recognized, these specific disclosures by UBS about its accumulation of mortgage-related securities undercut the inference that defendants knew or recklessly disregarded that their accumulation of the RMBS portfolio was inconsistent with their representations about risk management, much less that they intended to conceal or recklessly concealed that accumulation. [62]

In sum, plaintiffs have not plausibly alleged that UBS's representations regarding asset concentrations and risk diversification were materially misleading or that defendants were consciously reckless in making such representations in light of their accumulation of asset-backed securities.

### b. Valuation of and disclosures regarding UBS's mortgage-related assets

The second category of alleged misrepresentations relates to UBS's statements regarding its valuation of its mortgage-related

---

[61] The Swiss franc was equivalent to between 1.18 and 1.33 U.S. dollars in 2006.

[62] Plaintiffs argue that, in reaching this conclusion, the District Court impermissibly considered a "truth on the market" defense, But the relevance of UBS's disclosures regarding its accumulation is not to show that plaintiffs *knew* the truth about the portfolio, but rather to undercut the inference that UBS was attempting to conceal that truth.

assets. UBS represented that it employed "mark-to-market accounting," meaning that it valued its mortgage-related assets based on the price at which similar assets were trading in the market, *i.e.*, "observable market prices."[63]

The crux of plaintiffs' argument is that the sale by UBS of certain assets held by its internal hedge fund, DRCM, reflected the need to reduce the stated market value of, or "write down," that class of assets, and that this should have raised "red flags" that the IB's "similar securities" might be at risk. Instead, plaintiffs allege, UBS "disregarded . . . observable market inputs and red flags demonstrating that [its] mortgage-related asset portfolio was materially impaired." The District Court found deficient plaintiffs' allegations that the UBS defendants were "reckless" in ignoring these purported red flags. We agree.

As we have explained, to qualify as "reckless conduct" within the meaning of our securities laws, "the decision not to [write down the IB's mortgage-related securities portfolio] must have been highly unreasonable, representing an extreme departure from the standards of ordinary care."[64] In essence, plaintiffs allege that defendants *should have* predicted the impairment of the highly-rated (*i.e.*, AAA-rated) assets held by the IB, which were collateralized by

---

[63] *See, e.g.*, Joint App'x 375 ("[W]e go out to the market to get quotes on what it would actually cost to move these positions and extrapolate some of those across the portfolio.").

[64] *Rothman*, 220 F.3d at 90 (internal quotation marks omitted).

lower-rated assets, based on their knowledge of the write-downs in certain lower-grade (BBB- to B-rated), higher risk, mortgage-related assets held by DRCM. [65]

Assuming *arguendo* that plaintiffs are correct about what defendants *should have been doing*, this does not create a strong inference that the UBS defendants were reckless in failing to write down the IB's assets, in light of what it knew about DRCM's assets and the subprime market generally. The central premise of these securitized structures was that highly-rated tranches would withstand the devaluation of lower-rated tranches.[66] Indeed, the higher-rated assets held by the IB continued to trade at par value through mid-2007. *See* 2012 Op. at *16-17.

Plaintiffs have alleged that there was uncertainty and disagreement within UBS and in the market at large, about the valuation and risk exposure of mortgage-related assets. *See, e.g.*, Joint App'x 101 (an April 2007 UBS internal investigation concluded that "valuation uncertainties in [the] IB . . . were not sufficiently transparent and inherent risks not adequately analyzed"). However, the Complaint fails to create a strong inference that the UBS

---

[65] Although plaintiffs alleged in their Complaint that the assets held by the IB were "similar" to the assets held by DRCM, they acknowledge that the IB's holdings had AAA ratings, whereas the declines in the subprime market in early 2007 affected BBB-rated and lower grade mortgage-related assets.

[66] *See* Joint App'x 97-98 ("UBS risk models assumed AAA-rated bonds would never receive less than 98 percent of their face value."); *see also id.* at 138–39 (describing tranche structure and UBS illustration of risk profile of RMBS).

defendants recklessly disregarded known facts contradicting their public valuation of their highly-rated RMBS/CDO assets, or that their behavior represented an extreme departure from the ordinary standards of care.

While the collapse in the entire subprime market revealed UBS's failure to recognize the vulnerability of *all* its mortgage-related assets to have been poor judgment, poor business judgment—even if attributable to monetary incentives—does not establish an inference of recklessness that is "cogent and compelling [and] thus strong in light of other explanations."[67] We do not recognize allegations of "fraud by hindsight."[68]

## 2.    Tax Fraud Claims

We have held that the definition of "materiality" under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act.[69]

---

[67] *Tellabs*, 551 U.S. at 324 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged"). We have considered plaintiffs' additional allegations seeking to establish scienter and conclude that they do not create the requisite strong inference.

[68] *See Rothman*, 220 F.3d at 90 ("Generally, poor business judgment is not actionable under section 10(b)."); *Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."). *Cf. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (fraudulent intent is not established by alleging "the desire to . . . sustain . . . the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation*").

[69] *In re Morgan Stanley*, 592 F.3d at 360.

Accordingly, we affirm dismissal of the § 10(b) claims based on tax fraud for the reasons stated in Discussion Part B, *ante*.

### D.    Denial of Leave to Amend

Plaintiffs contend, finally, that the District Court erred in dismissing their Amended Complaint with prejudice because they have not yet amended directly in response to specifically identified pleading defects. We review a district court's denial of leave to amend for abuse of discretion, unless the denial was based on futility, in which case we review that legal conclusion *de novo*.[70]

Plaintiffs have already had one opportunity to amend their complaint. Although that amendment was not in response to a motion to dismiss identifying particular deficiencies in the pleadings, it is unlikely that the deficiencies raised with respect to the Amended Complaint were unforeseen by plaintiffs when they amended. Moreover, plaintiffs have identified no additional facts or legal theories—either on appeal or to the District Court—they might assert if given leave to amend.[71] We conclude that, in the circumstances presented, the District Court did not err in denying leave to amend.

---

[70] *Panther Partners Inc.*, 681 F.3d at 119. Because the District Court did not explain why it did not grant leave to amend, we will assume that the reason was futility and review the decision *de novo*.

[71] *Id.* (explaining that when assessing futility, "we consider the proposed amendments along with the remainder of the complaint") (internal quotation marks and citations omitted).

## CONCLUSION

To summarize, we hold that:

(1)  *Morrison* precludes foreign plaintiffs' claims under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") arising out of the purchase of foreign-issued securities on a foreign exchange, even where the securities are cross-listed on a domestic U.S. exchange.

(2)  The fact that a U.S. entity places a buy order in the United States for the purchase of foreign securities on a foreign exchange is insufficient to incur irrevocable liability, as set forth in *Absolute Activist*, in the United States.

(3) Plaintiffs' claims under §§ 11 and 12(a) of the Securities Act of 1933 were properly dismissed for failure to plead an actionable misstatement.

(4)  Plaintiffs' claims under § 10(b) of the Exchange Act based on the alleged Tax Fraud were properly dismissed for failure to plead an actionable misstatement.

(5)  Plaintiffs' § 10(b) claims based on the alleged CDO/RMBS Fraud were properly dismissed for failure to plead materiality or a strong inference of scienter.

(6)  The District Court did not err in denying plaintiffs leave to amend a second time.

Accordingly, we **AFFIRM** the September 13, 2011 and September 28, 2012 judgments of the District Court.